Filed 12/29/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BRIAN P. LANZ,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PETER GOLDSTONE,<br><br>        Defendant and Appellant. | A141694<br><br>(Sonoma County<br>Super. Ct. No. SCV254359) |

Appellant Peter Goldstone is a Santa Rosa attorney. So is respondent Brian Lanz. Lanz represented Hebe Garcia-Bolio (Bolio) in a *Marvin* action,[1] in connection with which Lanz had a contingency fee agreement. The *Marvin* action settled on the third day of trial, following which there soon arose a dispute as to the value of the settlement—and therefore Lanz's fee. Lanz filed suit against Bolio, who failed to respond, and her default was taken. Goldstone became Bolio's lawyer and, following relief from default, filed an answer and, as pertinent here, a cross-complaint. The cross-complaint had three causes of action, including breach of fiduciary duty and professional negligence, and it alleged several ethical violations by Lanz of the Rules of Professional Conduct and the Business and Professions Code, including that he acted with "moral turpitude."

By motions, Lanz defeated Bolio's claims in the cross-complaint, leaving extant only Lanz's claim against Bolio. That claim went to trial, with Lanz obtaining a complete victory, in a statement of decision highly critical of Bolio's conduct.

Lanz then sued Goldstone for malicious prosecution. Goldstone filed an anti-SLAPP motion to dismiss. The trial court denied it, concluding that Lanz met his burden

---

[1] *Marvin v. Marvin* (1976) 18 Cal.3d 660.

1

under prong two of the anti-SLAPP analysis, demonstrating a probability of success on all three elements of malicious prosecution. We reach the same conclusion, and we affirm.

**BACKGROUND**

**The Parties, the *Marvin* Action, and the Settlement**

Bolio and Denis Ronchelli were involved in a relationship that began in 1991 and ended in 2009. They were not married. They apparently lived in a house on King Street, Santa Rosa, a house owned by Ronchelli. He also owned a house in Modesto. The record does not reveal much else about either of them or their relationship. One thing we do know, because Goldstone tells us, is that Bolio is a CPA, apparently one who is, as Goldstone's counsel admitted at oral argument, "internationally certified."

In October 2009, Bolio retained Lanz to represent her in an action against Ronchelli, in connection with which Bolio signed an "Attorney-Client Contingency Fee Contract" (contract). The contract provided that Bolio was "hiring us to represent you in the matter of your claims against Denis W. Ronchelli, arising out of your relationship with him over the past 18 years. . . . If a court action is filed, we will represent you until a settlement or judgment, by arbitration or trial, is reached, and in connection with any appropriate post-trial motions."

The contract also provided as follows:

"6.     LEGAL FEES AND COSTS. We will only be compensated for legal services if a recovery is obtained for you. If no recovery is obtained, you will be obligated to pay only for costs, disbursements and expenses as described below.

"The fees to be paid by you to us will be 33 1/3 % (thirty-three and one-third percent) of the total recovery. Afterward, all unpaid costs and disbursements set forth in Paragraph 8, will be subtracted and the remainder paid to you. In the event that the case should go to trial or arbitration, or within 60 days from the first scheduled trial date or arbitration date, the fees to be paid by you to us will be 40% (forty percent) of the total recovery. [¶] . . . [¶]

2

"7.   NEGOTIABILITY OF FEES.  The rates set forth above are not set by law, but are negotiable between an attorney and client."

The contract also included a provision by which Bolio granted Lanz a lien against any prospective recovery securing payment of the sums owed him.  Finally, the agreement contained the express statement that Lanz does "not maintain errors and omissions (malpractice) insurance."

Lanz filed suit on behalf of Bolio, a *Marvin* action against Ronchelli:  *Hebe Garcia-Bolio v. Denis Ronchelli, et al.*, Sonoma County Superior Court No. SCV-246349 (*Marvin* action).  The record contains little of what occurred in the *Marvin* action.  What we do know is that it proceeded to trial in August 2010, and that it was settled on the third day of trial.  The settlement was overseen by the trial judge (the Honorable Elaine Rushing), and was memorialized in a written "Settlement Agreement and Order" signed by the parties and approved by Judge Rushing on August 30, 2010.

The settlement agreement provided that Ronchelli would pay Bolio $10,000 cash, pay off the $106,000 mortgage balance on the Modesto house, and transfer ownership of that house to Bolio.  In exchange, Bolio agreed to dismiss her causes of action and vacate the house on King Street where she had been residing.

According to Lanz's later-filed declaration, in agreeing to the settlement, Bolio advised Lanz that the fair market value of the Modesto house was $106,000 and that she wanted that house, not its cash equivalent, as part of the settlement.  Bolio's version of events would be different, claiming, among other things, that the Modesto house was worth $80,000 and, moreover, had some $20,000 in deferred maintenance.

Within days of the August 30 settlement, the differences between Lanz and Bolio had resulted in several pieces of correspondence between them, including these:

On September 9, Bolio sent Lanz an e-mail asserting that (1) they had a subsequent agreement to cap his contingency fee percentage at 33 percent; (2) the value of the Modesto house was far less than $106,000; and (3) Lanz later promised he would shift his fees and costs to Ronchelli and not seek to recover them from Bolio.  It bears

3

noting that Bolio's lengthy e-mail made no claim about, or criticism of, any aspect of Lanz's handling of her case.

Lanz responded with two letters on September 15. One letter began as follows: "The following [is] the estimated settlement statement you requested, for your case against Denis Ronchelli. I cannot provide a statement of actual figures, as first of all, the case is not completed in that the required transactions have not yet been completed. Second, the value of the home and Denis's waiver of his request for reimbursement, can only be estimated. With that in mind, the statement being provided is an estimate of what I believe the fees to be. The issue of resolving the value of the recovery, is why I advised you to consult with separate counsel." The letter then went on to provide an itemized breakdown of various values.

The other letter provided in pertinent part as follows:

"This letter shall confirm that pursuant to your request, I obtained an extension of the deadline for you to advise Denis Ronchelli if he needs to proceed in giving the [Modesto house] tenant, notice to vacate, until September 11, 2010 and that I've advised you of my need to know, at least four times now, if you want him to follow through with giving him notice. As of this date, you have not given me an answer on this issue and the deadline has now passed. . . ."

"This letter shall also confirm that I've advised you we have an issue to resolve, regarding the payment of my fees and costs. The issue being that the fees to be paid, have to be based on what we understand or believe the value of the home and the value of the waiver from Denis, to be. This letter shall also confirm that immediately after we signed the settlement agreement in this case, I advised you to consult with separate counsel on the issue of my fees, as we may disagree on the values of the home and the waiver. Further, that I also offered to advance the fees for you to have such a consultation. As of this date, you have not told me if you plan to consult with separate counsel and/or if you need me to advance the fees to do so. I would appreciate you letting me know at your earliest convenience.

"Thank you for your time and consideration in this matter."

4

Thereafter, Lanz filed in the *Marvin* action a notice of attorney lien in the amount of $60,000 against the settlement proceeds, claiming it was for fees and costs. Lanz also filed an action against Bolio.

**Lanz's Action Concerning the Fee**

On November 1, 2010, Lanz filed a complaint, and on December 1, an amended complaint, against Bolio concerning the fee dispute. It alleged two claims, for breach of contract and a common count.

Bolio was served, but did not file a response, and on January 11, 2011, Lanz filed a request for entry of default.

Sometime in early February, probably the 2nd, Bolio contacted Goldstone to represent her. The record does not contain any evidence from Goldstone as to what he did in early February. The record does contain this evidence from Lanz:

"[O]n or about February 4, 2011 [Lanz] was contacted by Bolio's new attorney, Peter Goldstone ('Goldstone'), who demanded that I voluntarily set aside Bolio's default. [¶] When I declined, Goldstone personally delivered an unfiled cross-complaint to my office on February 14, 2011 and threatened to file the cross-complaint unless I dismissed my complaint against Bolio and walked away from my unpaid fees and unreimbursed costs. Goldstone made it clear to me that the threatened litigation would be so expensive and protracted that the cost to defend the cross-complaint would exceed the amounts owed to me under the contingent fee agreement. In this regard, Goldstone rejected my suggestion that we submit all disputes to less expensive binding arbitration and told me that he would not rule out the possibility of prosecuting an appeal from any judgment. In order to remind me that I would need to defend the cross-complaint at my own expense, Goldstone asked me if I was insured even though Goldstone knew from the contingent fee agreement (which was attached to the unfiled cross-complaint) that I did not carry malpractice insurance."[2]

---

[2] The record does not reveal when the cross-complaint sent to Lanz on February 14 was prepared. The record does contain Bolio's declaration signed the day before, February 13, where she testified that "[s]hould discovery yield facts sufficient to

5

Lanz did not capitulate, or even agree to lift the default. So, on behalf of Bolio, Goldstone filed a motion for relief from default. The motion was accompanied by a four-page declaration of Bolio that described for several paragraphs her case against Ronchelli and the dispute about the fee. Not once in those four pages is there any mention that Lanz in any way mishandled her case.

On March 29, the motion for relief from default was granted, and the default vacated. On April 1, Goldstone filed Bolio's answer to the complaint. And a cross-complaint.

**Bolio's Cross-Complaint Against Lanz**

Bolio's cross-complaint against Lanz alleged three causes of action: (1) breach of fiduciary duty; (2) declaratory relief; and (3) professional negligence. The cross-complaint was 10 pages long, containing 42 paragraphs, nine of which were "facts common to all causes of action" setting forth generally the history described above. The cross-complaint then turned to the specific cause of action for breach of fiduciary duty, and alleged the following:

"18. As her attorney and fiduciary, Lanz owed fiduciary duties to Hebe of undivided service, loyalty and integrity in representing Hebe in preparing and litigating her case. The relation between attorney and client is a fiduciary relation of the very highest character and binds the attorney to most conscientious fidelity, including good faith, absolute and perfect candor, openness, honesty, and the absence of any deception or concealment, however slight. Hebe is informed and believes and thereon alleges that included in such duties were the duty to avoid conflicts of interest, and to make full and complete disclosure of all pertinent facts known by Lanz, the duty to properly investigate all the consequences and damages caused by Lanz's and Hebe's acts and omissions, including but not limited to the settlement of the lawsuit and payment of fees from the proceeds therefrom. [¶] . . . [¶]

---

so plead, I may seek leave of this Court to cross-complain[] against Lanz for breach of fiduciary duty and professional negligence."

6

"20.    Hebe is informed and believes and thereon alleges that commencing in or about October 2010, Lanz . . . willfully and intentionally breached [his] fiduciary duties toward Hebe, in the following particulars:

"a.  Lanz failed to properly prepare for the trial;

"b.  Lanz failed to adequately advise and inform Hebe of the consequences of entering into the Settlement Agreement;

"c.  Lanz placed his own financial interests in the outcome of this case before the financial interests of Hebe and acted counter to Hebe's best interests and in his own best interest;

"d.  Lanz failed to properly listen to Hebe's concerns, advice, and counsel on substantive matters;

"e.  Lanz acted in a coercive manner with moral turpitude when he persuaded Hebe to enter into a settlement agreement that was in Lanz's best interest but not in Hebe's best interest;

"f.  Lanz failed to properly represent and protect Hebe at trial and in the negotiation of the settlement agreement;

"g.  Cross-Defendants' conduct yet to be discovered.

"21.    In doing the acts herein alleged, and by failing to communicate with Hebe, and failing to properly prepare and investigate the case, Cross-Defendants failed to comply with the standards of conduct established by the requirements of the Rules of Professional Conduct, including, but not limited to, Rules 3-110, 3-300, and 3-500.

"22.    As an attorney who secured payment of fees by acquiring a charging lien against his client's future judgment or recovery, Lanz acquired an interest adverse to his client, Hebe, and so was required to comply with the requirements of Rules of Professional Conduct Rule 3-300.  In relevant part, this required that Lanz advise Hebe in writing that she was entitled to seek the advice of an independent lawyer of her choice and be given a reasonable opportunity to seek that advice and that Hebe consent in writing to the terms of that acquisition.

"23.    Within the body of the Fee Agreement the language granting to Lanz a charging lien against the proceeds from the case or against any property of Hebe fails to advise in [*sic*] Hebe in writing (or at all) that she could seek the advice of an independent lawyer of her choice in deciding whether to enter into an attorney's fees agreement containing a charging lien.  Hebe is informed and believes, and thereupon alleges that the lien asserted by Lanz is a charging lien in violation of Business and Professions Code section 6147, subd. (a)(4); Rules of Professional Conduct Rule 3-300 and the case law interpreting and applying said Statute and Rule.

"24.    Lanz has breached his fiduciary duty to Hebe by including within his Fee Agreement a charging lien that is not drawn in conformity with California law and thereby placing his own interest above the interest of his client.

"25.    The conduct of said Cross-Defendants herein alleged fell below the standards of professional conduct for attorneys and was in breach of the Cross-Defendants' fiduciary duties of full and fair disclosure, loyalty, candor and diligence, and constituted a material breach of said fiduciary duties.

"26.    By doing the acts set forth above willfully and intentionally, either for his own benefit or as ostensible agent for Hebe, Lanz failed to comply with the standards of conduct established by the Rules of Professional Conduct including RPC Rules 3-300, 3-310 and 3-500, and Business and Professions Code Sections 6068 and 6106.  Lanz's conduct fell below the standards of professional conduct for attorneys and was in breach of his professional and fiduciary duties herein alleged.  [¶] . . . [¶]

"29.    Lanz knowingly and intentionally engaged in such actions with an intent to cause such harm to Hebe, or with reckless disregard for the consequences of such actions. Said actions by Lanz were despicable, and were undertaken for the purpose of inducing Hebe to act in a manner contrary to her own interests and in the interests of Lanz and thereby procuring a benefit for Lanz, to the detriment of Hebe, and causing such harm, with malice, fraud and oppression, as defined in Section 3294 of the Civil Code, and by reason thereof Hebe is entitled to an award of punitive and exemplary damages against Lanz, in an amount according to proof."

8

Those charging allegations were incorporated into the second and third causes of action.

In sum, each cause of action alleged that with "moral turpitude" Lanz placed "his own financial interests" before Bolio's and breached his fiduciary and professional duties in several ways: (1) by including within the contingency fee agreement an "[in]valid" charging lien "in violation" of rule 3-300 of the Rules of Professional Conduct; (2) by "violat[ing]" the disclosure requirements contained in Business and Professions Code section 6147, subdivision (a)(4); (3) by "persuad[ing]" Bolio to enter into a settlement in which Bolio "gave up" her "['community property'] ownership" of Ronchelli's Santa Rosa property and obtained "no recovery" as a result; and (4) by "persuad[ing]" Bolio to enter into a settlement rather than completing trial and "procuring" a "better result . . . at substantially less expense."

Lanz filed an answer to the cross-complaint, and the discovery began. While the record does not reflect all that happened thereafter, we do know that at some point the parties tried to resolve the dispute. To no avail.

On September 19, 2011, Lanz filed a motion for summary adjudication, asserting that all three claims in Bolio's cross-complaint lacked merit. The motion was set for hearing on December 6. The Superior Court of Sonoma County, Local Rules, rule 5.4 requires the moving and opposing parties to "make a reasonable and good faith attempt to informally resolve . . . motion[s]" for summary adjudication. Despite that, according to Lanz, Goldstone ignored Lanz's request to meet and confer, and indicated he would continue to prosecute the cross-complaint and threatened to conduct costly discovery, "cost[ing] much more than [the action's] . . . eventual benefit,"—all, according to Lanz, to "squeeze a settlement . . . before the summary-adjudication motion could be heard . . . ."

Whatever Goldstone's motivation, his threats apparently did not come to pass. Rather, according to Lanz, Goldstone recommended that Bolio declare bankruptcy. And she did, on November 7: *In re Hebe Garcia-Bolio*, United States Bankruptcy Court, Eastern District of California, No. 11-93911 (bankruptcy action). Attorney Patrick

9

M. Kolasinski represented Bolio in the bankruptcy action, not Goldstone. The bankruptcy action caused the Lanz-Bolio litigation to be stayed, which stay lasted until February 24, 2012, when the bankruptcy closed. Pertinent here, Bolio did not list the breach of fiduciary duty claim or the professional negligence claim in the bankruptcy schedule.

Following the lifting of the stay, Lanz filed a motion to file a second amended complaint in his case against Bolio, to assert only one cause of action, for declaratory relief. Then, on March 12, Lanz filed a motion for judgment on the pleadings as to the breach of fiduciary duty and professional negligence claims in Bolio's cross-complaint, on the basis that those claims failed under the doctrine of judicial estoppel because Bolio failed to disclose the claims in her bankruptcy schedules.

Two days later, March 14, Lanz moved ex parte to have his previously filed motion for summary adjudication reset for briefing and hearing.

That same day, Goldstone substituted out as Bolio's attorney. She was now in pro per.

Lanz's motions for judgment on the pleadings and summary adjudication came on for hearing on June 28, before the Honorable Arthur Wick. Judge Wick granted judgment on the pleadings, holding that Bolio was estopped from pursuing her claims for breach of fiduciary duty and negligence because she failed to include them as potential assets in her bankruptcy schedules. He also granted Lanz's motion for summary adjudication of Bolio's declaratory relief cause of action. Bolio's cross-complaint was thus dismissed in its entirety.

What remained was Lanz's original dispute with Bolio, now in a single cause of action for declaratory relief.

**Trial on Lanz's Complaint**

On November 26 and 27, 2012, a court trial before Judge Wick was held on Lanz's case. As Judge Wick described it, "The single cause of action for declaratory relief seeks only a judicial declaration as to the lien and deed of trust at issue and a claim

10

for attorney fees and costs in the present action based on the underlying contract, the Attorney-Client Contingency Fee Contract . . . ."

On January 23, 2013, Judge Wick filed a six-page statement of decision, a decision that can only be described as a total victory for Lanz. The decision held that Lanz had a valid lien; that the fair market value of the Modesto house was $106,000; and that Lanz was to recover $48,824.20 for his attorney fee and costs.

In reaching his decision, Judge Wick made several observations and holdings pertinent here, including these:

"In keeping with this court's Trial Order, plaintiff's evidence consisted of a rather straight forward presentation of the situation involving these two parties and the underlying litigation, with representation of the defendant by plaintiff herein.

"The shorter version of the facts indicates that plaintiff served as the attorney for defendant herein in her *Marvin* action filed against her long time paramour. That matter went to trial and during trial the entire *Marvin* action was settled.

"As soon as the underling [*sic*] settlement was reached and approved by the court, defendant fired plaintiff as her attorney. Defendant immediately asserted that she recovered nothing by way of the *Marvin* action, despite receiving real property and cash as a result of the subject settlement. Defendant's assertion is patently false.

"Thereafter, by way of the present action plaintiff seeks to recover his fees and costs incurred as defendant's counsel in the *Marvin* matter.

"Plaintiff served defendant herein with a Notice of Attorney Lien. Thereafter, sensing a problem with the lien, attorney Jilka, on behalf of defendant Ronchelli in the *Marvin* action, prepared a Motion for Instructions Regarding Settlement Agreement and to Expunge Lis Pendens. Said motion was filed on November 16, 2010.

"The subject motion was heard by Judge Rushing and on December 21, 2010 Judge Rushing issued a written ruling ordering among other things that:

" '1. Prior to conveyance of the real property at 505 Kimble Street, Modesto, California to plaintiff, defendant Denis Ronchelli shall give a deed of trust to attorney Lanz which secures Mr. Lanz's attorneys fee lien against this property. After delivery of

11

this deed of trust to Mr. Lanz, defendant Ronchelli shall deliver a deed to this property to plaintiff.'

"It appears to this court that immediately thereafter [defendant] instituted a campaign against her former attorney, attacking him both personally and professionally. This unwarranted assault continues to this day.[3]" (Fns. omitted.)

Judge Wick's decision then continued:

"From a careful review of all testimony and the supporting exhibits two observations became readily apparent to this court:  first, plaintiff handled the underlying *Marvin* action appropriately, including the settlement.  It does not appear to this court that the host of criticisms leveled by defendant at plaintiff herein is valid.  And, second, defendant has attempted to rewrite what did actually occur in the underling [*sic*] matter to suit her current needs, wants, or desires.  Accordingly, this court finds defendant's testimony incredulous, inflated, spiteful, and lacking all persuasive value.[4]"  Judge Wick's decision concluded with these two paragraphs:

"Two other issues of importance are in need of being addressed here.  First, it appears plaintiff offered defendant an opportunity to arbitrate the entire dispute herein. Neither defendant, nor her new attorney of record, chose to accept plaintiff's offer to arbitrate the fee dispute.

"Second, defendant claims her bankruptcy action bars plaintiff's right to recover herein.  The testimony on this topic clearly supports plaintiff's position on this issue *and* this court could not find *any evidence* supporting defendant's claim of avoidance or

---

[3] "During trial defendant repeatedly called her former attorney a liar and deceitful, and tried to cast him as a conspirator in all things wrong in defendant's life.  Frankly, defendant's obvious hate and disrespect for her former attorney cast considerable doubt on her credibility as a witness herein."

[4] "As an example of this spiteful and illogical testimony, defendant testified that the property value of the home she was given in settlement of the underlying *Marvin* action was substantially less than that ascribed to it by a licensed real estate appraiser during this trial.  However, in prior emails authored by defendant she cited its value *as exactly the same* as its appraised value.  Her efforts to disavow this evidence only made her less credible in the eyes of the court."

12

discharge of plaintiff's lien and/or debt in the subject bankruptcy action." (Fn. omitted, italics added.)

What occurred next was Lanz's malicious prosecution suit.

**Lanz Sues Goldstone for Malicious Prosecution**

On September 26, 2013, Lanz sued Goldstone for malicious prosecution. Goldstone filed an answer, followed by a special motion to strike pursuant to Code of Civil Procedure section 425.16 (SLAPP or anti-SLAPP motion), set for January 23, 2014. The anti-SLAPP motion was accompanied by a five-page declaration of Goldstone and a declaration of his attorney attaching several documents. The motion also requested judicial notice of 18 documents.

Lanz filed opposition, Goldstone a reply, and the anti-SLAPP motion came on for hearing before the Honorable Gary Nadler.

On March 13, Judge Nadler issued a comprehensive, eight-page order denying the motion, from which Goldstone filed a timely appeal.

**DISCUSSION**

1. **SLAPP Law and the Standard of Review**

Subdivision (b)(1) of section 425.16 of the Code of Civil Procedure provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Subdivision (e) of section 425.16 elaborates the four types of acts within the ambit of a SLAPP.

A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the acts underlying the plaintiff's complaint fit one of the categories spelled out in section 425.16, subdivision (e). If the court finds that such a showing has been made, it

13

must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

Here, the parties agreed that Lanz's malicious prosecution case came within the first step of the anti-SLAPP analysis. (See *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 215 ["The plain language of the anti-SLAPP statute dictates that every claim of malicious prosecution is a cause of action arising from protected activity because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding."].)

So, all the briefing and Judge Nadler's analysis addressed only the second step in the SLAPP analysis, as will we. And as to how we decide that step, we set forth the governing law in *Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 989–990 (*Grewal*):

"We decide the second step of the anti-SLAPP analysis on consideration of 'the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b).) Looking at those affidavits, '[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law.' (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700.)

"That is the setting in which we determine whether plaintiff has met the required showing, a showing that is 'not high.' (*Overstock.com, Inc. v. Gradient Analytics, Inc., supra,* 151 Cal.App.4th at p. 699.) In the words of the Supreme Court, plaintiff needs to show only a 'minimum level of legal sufficiency and triability.' (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438, fn. 5.) In the words of other courts, plaintiff needs to show only a case of 'minimal merit.' (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 675, quoting *Navellier v. Sletten* (2002) 29 Cal.4th 82, 95, fn. 11.)

" . . . As the Supreme Court early on noted, the anti-SLAPP statute operates like a 'motion for summary judgment in "reverse." ' (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 719.) Or, as that court would later put it, 'Section 425.16 therefore

14

establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.  [Citation.]'  (*Varian Medical Systems, Inc. v. Delfino, supra,* 35 Cal.4th at p. 192; accord, *Taus v. Loftus* (2007) 40 Cal.4th 683, 714.)

"Numerous Courts of Appeal have articulated the test in similar language.  (See *Tichinin v. City of Morgan Hill* (2009) 177 Cal.App.4th 1049, 1062 ['a standard "similar to that employed in determining nonsuit, directed verdict or summary judgment motions" ']; *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 317 ['plaintiff's burden as to the second prong of the anti-SLAPP test is akin to that of a party opposing a motion for summary judgment']; *Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907 ['similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment'].)"

With those principles in mind, we turn to an analysis of whether Lanz established a probability that he will prevail on his claim for malicious prosecution, an analysis we make on de novo review.  (*Grewal, supra,* 191 Cal.App.4th at p. 988.)  And conclude that he did.

### 2.   The Law of Malicious Prosecution

"To establish a cause of action for the malicious prosecution of a civil proceeding, a plaintiff must plead and prove that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations]."  (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 50 (*Bertero*).)

*Bertero* went on to explain the two reasons why malicious prosecution is actionable:  "The malicious commencement of a civil proceeding is actionable because it harms the individual against whom the claim is made, and also because it threatens the efficient administration of justice.  The individual is harmed because he is compelled to defend against a fabricated claim which not only subjects him to the panoply of psychological pressures most civil defendants suffer, but also to the additional stress of

15

attempting to resist a suit commenced out of spite or ill will, often magnified by slanderous allegations in the pleadings." (*Bertero, supra,* 13 Cal.3d at pp. 50–51.) And "[t]he judicial process is adversely affected by a maliciously prosecuted cause not only by the clogging of already crowded dockets, but by the unscrupulous use of the courts by individuals '. . . as instruments with which to maliciously injure their fellow men.' " (*Id.* at p. 51.)

And, of course, the claims of malfeasance are all in the public record. (See *Sagonowsky v. More* (1998) 64 Cal.App.4th 122, 132: ["The remedy of a malicious prosecution action lies to recompense the defendant who has suffered out of pocket loss in the form of attorney fees and costs, as well as emotional distress and injury to reputation because of groundless allegations made in pleadings which are public records."]).

### 3. Lanz Demonstrated a Probability of Prevailing on Malicious Prosecution

#### A. Favorable Termination

Goldstone contends that Lanz cannot demonstrate a probability of prevailing because he cannot demonstrate any, let alone all, of the three elements of the tort, beginning with the argument that Lanz cannot establish favorable termination.

Following recitation of some boilerplate principles of favorable termination, Goldstone begins his argument with focus on the fact that two of the three claims in the cross-complaint—breach of fiduciary duty and professional negligence—were dismissed on the basis that they were not included in Bolio's bankruptcy filings. And, Goldstone concludes, "Applying the above principles to the case at bench, *as a matter of law, LANZ cannot establish a favorable termination of Bolio's causes of action for malpractice and breach of fiduciary duty.* The court in the Underlying Action dismissed Bolio's malpractice claims on LANZ's motion for judgment on the pleadings on the single ground that Bolio failed to identify the Cross-Complaint in her bankruptcy petition and, thus, was *procedurally* barred from pursuing those claims in Superior Court."

To begin with, we fail to see the significance of the argument, as the third claim in the cross-complaint was resolved on the merits, as Goldstone essentially concedes. This

16

ends the inquiry, as expressly held by numerous cases, including *Bertero*, where the court held that where several claims are advanced in the underlying action, each must be based on probable cause. As the court described it, "In arguing against the application of *Raboff* and *Singleton* in the instant circumstances, NGC urges '[t]he test should be whether [defendants] had reasonable grounds to seek the relief they sought in their Cross-Complaints, not whether they had such grounds for asserting each of the three theories contained in the Cross-Complaint.' We disagree. . . . We see no reason for permitting plaintiffs and cross-complainants to pursue shotgun tactics by proceeding on counts and theories which they know or should know to be groundless." (*Bertero, supra,* 13 Cal.3d at p. 57.)

This rule was reaffirmed in *Crowley v. Katleman* (1994) 8 Cal.4th 666 (*Crowley*), a case where a decedent's wife contested his will that left the bulk of the estate to his own attorney, a contest that asserted six separate grounds. The action terminated in favor of the attorney, and the will was admitted to probate. The attorney then brought a malicious prosecution action against the wife and her attorneys, alleging that defendants had acted without probable cause in asserting five of the six grounds in the will contest. Defendants demurred, asserting that probable cause existed for the sixth ground for contesting the will, thus barring the malicious prosecution action. The trial court sustained the demurrer and dismissed the action. The Supreme Court reversed, "reaffirm[ing] the rule of *Bertero*. . . ." (*Id.* at p. 695.) (Also see *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 333 ["[a] claim for malicious prosecution need not be addressed to an entire lawsuit; it may . . . be based upon only some of the causes of action alleged in the underlying lawsuit."].)

Goldstone's opening brief does not even mention *Bertero*, and relies on one case, *Friedberg v. Cox* (1987) 197 Cal.App.3d 381, 386–387 (*Friedberg*),[5] which, however myopically, observed that *Bertero* was based on "facts distinctly different," and applied the "primary right" theory to hold that the relevant criterion was the judgment as a whole.

---

[5] For that matter, Goldstone's opening brief mentions *Crowley* only as "disagreeing with *Friedberg* on other matters."

Lanz, of course, relies on *Bertero* and *Crowley,* and all Goldstone's reply brief says is that Lanz "mischaracterizes the holdings," a description Goldstone then spends the next four pages in a strained effort to justify. We are dismayed by Goldstone's disregard of the law. For example:

*Mabie v. Hyatt* (1998) 61 Cal.App.4th 581, 589–594 (*Mabie*), discussed this issue for over five pages, confirming the holdings in *Bertero* and *Crowley* and other cases. Lanz cites *Mabie* five times in his respondent's brief. Goldstone's reply does not even mention the case.

Goldstone also ignores the holding of our colleagues in Division Four, in *Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135 (*Sierra Club*). There, in affirming a judgment on a jury verdict for plaintiff in a malicious prosecution action, the court observed as follows: "Our Supreme Court in *Crowley* has pointed out that it does not follow from *Friedberg*'s primary right theory that a ruling striking two out of three theories of liability is not at least a ' "partial favorable termination" ' for purposes of malicious prosecution. (*Crowley v. Katleman, supra,* 8 Cal.4th at p. 686.) 'Whether such a termination is sufficient to support a malicious prosecution action is, again, a question of policy under the substantive law of that tort.' (*Ibid.*) [¶] Stated somewhat differently, the malicious prosecution plaintiff need not demonstrate that the entire underlying proceeding was utterly groundless. Groundless charges coupled maliciously and without probable cause with well-founded causes are no less injurious for the coupling. [Citation.] Thus, a malicious prosecution plaintiff is not precluded from establishing favorable termination where severable claims are adjudicated in his or her favor. [Citation.]" (*Sierra Club, supra,* 72 Cal.App.4th at pp. 1152–1153.)

To close this discussion, we quote from Lanz's respondent's brief, which argued as follows: "Contrary to Goldstone's argument in his Opening-Brief (page; 2), a malicious-prosecution action may be maintained where only one of several factual or legal theories in a 'single cause of action' (*Kreeger vs. Wanland* (2006) 141 Cal.App. 4th 826, 834)—including a cause of action for declaratory relief (*Camarena vs. Sequoia*

18

(1987) 190 Cal.App. 3d 1089, 1097)—lacks probable cause." Neither case is mentioned in Goldstone's reply.

Beyond all that, Goldstone's fundamental argument—that the basis for the dismissal of two of the three claims was procedural, and therefore not a favorable termination—is wrong.

In *Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, the trial court granted judgment on the pleadings for the defendant in a malicious prosecution, holding that the dismissal of the underlying action based on the parol evidence rule was not a favorable termination. The Supreme Court reversed, beginning its analysis as follows: "To determine 'whether there was a favorable termination,' we 'look at the judgment as a whole in the prior action . . . .' [Citation.] 'It is not essential to maintenance of an action for malicious prosecution that the prior proceeding was favorably terminated following trial on the merits.' [Citation.] Rather, '[i]n order for the termination of a lawsuit to be considered favorable to the malicious prosecution plaintiff, the termination must reflect the merits of the action and the plaintiff's innocence of the misconduct alleged in the lawsuit.' [Citation.]" (*Id.* at pp. 341–342.)

Our colleagues described it this way: "When the proceeding terminates other than on the merits, the court must examine the reasons for termination to see if the disposition reflects the opinion of the court or the prosecuting party that the action would not succeed." (*Sierra Club, supra,* 72 Cal.App.4th at p. 1149.)

And should there be a conflict as to the circumstances of the termination, "the determination of the reasons underlying the dismissal is a question of fact." (*Ross v. Kish* (2006) 145 Cal.App.4th 188, 198.) In light of this, it is perhaps enough to say that under the reverse summary judgment analysis required under the SLAPP analysis, this ends the matter. But even if not, the termination here was favorable to Lanz.

Appropriately analyzed, one could conclude that the failure to list the claims on the bankruptcy schedule reflected Bolio's—or perhaps her bankruptcy attorney's—opinion "that the action would not succeed." (*Sierra Club, supra,* 72 Cal.App.4th at p. 1149; see also *Gottlieb v. Kest* (2006) 141 Cal.App.4th 110, 116.) Maybe the claims

19

were not listed on the schedule because Bolio's bankruptcy attorney did not want to be responsible for perpetuation of a malicious prosecution. (See *Zamos v. Stroud* (2004) 32 Cal.4th 958, 966–968.)

Regardless, the claims were in essence abandoned, and such abandonment can be favorable termination, as is generally held where a voluntary dismissal is filed. (*MacDonald v. Joslyn* (1969) 275 Cal.App.2d 282, 289; *Weaver v. Superior Court* (1979) 95 Cal.App.3d 166, 185.) Or where an action has been dismissed for failure to bring it to trial within the statutory period for discretionary dismissal, as this reflects on the merits of the action, a reflection that "arises from the natural assumption that one does not simply abandon a meritorious action once instituted." (*Minasian v. Sapse* (1978) 80 Cal.App.3d 823, 827.) Or a dismissal due to discovery sanctions, as it may reflect a "concession [plaintiff's] claims . . . lacked merit." (*Ross v. Kish, supra,* 145 Cal.App.4th at p. 192; *Daniels v. Robbins, supra,* 182 Cal.App.4th 204, 217–218.)

## B. Lack of Probable Cause

If there is " 'no dispute as to the facts upon which an attorney acted in filing the prior action, the question of whether there was probable cause to institute that action is purely legal.' [Citation.] 'The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted.' [Citation.]" (*Daniels v. Robbins, supra,* 182 Cal.App.4th at p. 222.) So, it is often said that "the existence or absence of probable cause has traditionally been viewed as a question of law to be determined by the court, rather than a question of fact for the jury. . . . [¶] . . . [It] requires a sensitive evaluation of legal principles and precedents, a task generally beyond the ken of lay jurors . . . ." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 875 (*Sheldon Appel*).)

On the other hand, when there is a dispute as to the state of the defendant's knowledge and the existence of probable cause turns on resolution of that dispute, there becomes a fact question that must be resolved before the court can determine the legal question of probable cause. (See *Sheldon Appel, supra,* 47 Cal.3d at p. 881 ["[T]he jury must determine what facts the defendant knew . . . ."].)

20

Here, there is necessarily a "dispute" as to the state of Goldstone's knowledge before he filed the cross-complaint, especially as he put in no evidence to show what he knew, or what he did, or even to whom he spoke. Nothing.

We note that Goldstone's brief asserts this: "In evaluating the viability of the causes of action, GOLDSTONE also justifiably relied on his client's sworn testimony concerning the strength of her *Marvin* case (i.e., her oral agreement with Ronchelli that he would provide for her financial well-being at the conclusion of their relationship in exchange for Bolio providing her affection and domestic services during their relationship), and her recollection of LANZ's failures in prosecuting the *Marvin* Action. (1 JA 44:7-11, 73:4-14, 74:4-14, 75:12–76: 16, 77:1-24, and 80:1-7; *see also* 1 JA 49 at nos. 1, 6, 8, and 14; 1 JA 159:11–160:1; [citation].) Thus, given Bolio's testimony and circumstantial evidence of Ronchelli's wealth, there clearly was probable cause to pursue a cause of action that the settlement LANZ urged upon Bolio at the 11th hour during trial was outside the realm of reasonableness. [Citation.] A settlement that required Bolio to abandon any claim to the Santa Rosa home she had lived in for years in exchange for a dilapidated home in Modesto and $10,000 in cash was highly questionable. Stated another way, LANZ had not pled and cannot factually support a contention that the malpractice claims were so lacking in merit that all reasonable attorneys would conclude the claims lacked probable cause."

As to this, we observe that the record references—JA 44, 49, 73–77, 80—all refer either to deposition testimony Bolio gave on April 28, 2011 or her answers to interrogatories, all necessarily after the cross-complaint was filed.

Two pages later, Goldstone's brief asserts that he owed Bolio "a duty of zealous representation," and goes on to argue as follows:

"Courts must be mindful that attorneys 'face an impossible dilemma if they are subject to claims of malicious prosecution by opponents in litigation because they vigorously represent their client, yet they are also subject to claims of legal malpractice by their client if they fail to provide the vigorous representation to which the client is entitled.' [Citation.] Moreover, '[z]ealous representation sometimes requires an attorney

21

to go out on a limb, to be innovative and creative in fashioning theories of liability or defense. Accordingly, an attorney needs only a reasonable and honest belief in the viability of each theory and the evidence supporting that theory, not a conviction his client will prevail, to justify filing a claim or defense.' [Citation.]

"GOLDSTONE reviewed documentation, evidence, pleadings, and attended the deposition of his client. After conducting such analysis of his case, GOLDSTONE determined there was probable cause to pursue and maintain the Cross-Complaint. GOLDSTONE had a reasonable and honest belief in the viability of each cause of action and the factual basis for the claims. The law favors zealous representation, and allowing LANZ's malicious prosecution claim to proceed beyond this early pleading stage will have the effect of chilling zealous representation."

As indicated, Goldstone's brief cites nothing in support of the claim in the second paragraph that Goldstone "reviewed documentation, evidence, pleadings." And the record contains absolutely no support for the representation. Finally, and contrary to Goldstone's unsupported position here, we note the declaration he prepared for Bolio that she signed on February 13, 2011, representing to the court that she might file claims against Lanz "[s]hould discovery yield facts sufficient to so plead . . . ."

But even Goldstone's unsupported representation does not support the accusations and allegations with the most serious charges in the cross-complaint—Lanz's violations of the Rules of Professional Conduct. Specifically:

As quoted above, the cross-complaint accused Lanz of placing "his own financial interests" before Bolio's and that he breached his fiduciary and professional duties in several ways, for example, by including within the contingency fee agreement an "[in]valid" charging lien "in violation" of Rules of Professional Conduct, rule 3-300. But Bolio's only contract with Lanz was a "Contingency Fee Contract," and no reasonable attorney would assert a violation of rule 3-300 in that setting, as that rule does not apply to a contingent fee agreement, as held in *Plummer v. Day/Eisenberg, LLP* (2010) 184 Cal.App.4th 38. There, in a case decided almost a year before Goldstone filed the cross-complaint, the Court of Appeal expressly held that a contingent fee agreement

22

"need not comply with rule 3-300" because the " 'inclusion of a charging lien in [an] initial contingency fee agreement does not create an 'adverse interest' to the client' " within the meaning of rule 3-300. (*Id.* at p. 49.)[6]

Likewise was there an issue of probable cause as to the allegation in the cross-complaint that Lanz breached his fiduciary and professional duties by persuading Bolio to enter into a settlement in which she gave up her ownership interest in Ronchelli's real property and obtained "no recovery" as a result. As thereafter explained in Bolio's responses to special interrogatories, this allegation was apparently predicated on the supposition that the settlement required Bolio to "relinquish . . . all of her community property," causing Bolio to make "no affirmative recovery" but rather to suffer a net "loss" from the settlement. But *Marvin* held that "[t]he provisions of the Family Law Act do not govern the distribution of property acquired during a nonmarital relationship" (*Marvin, supra,* 18 Cal.3d at p. 665), a rule confirmed many times since. (*Schafer v. Superior Court* (1986) 180 Cal.App.3d 305, 306–307; *Friedman v. Friedman* (1993) 20 Cal.App.4th 876, 883; *Velez v. Smith* (2006) 142 Cal.App.4th 1154, 1175.)

In sum, there was no community property. And the facts are both houses were owned by Ronchelli, who held title to both "as an unmarried man" his sole ownership thus "presumed." (Evid. Code, § 662.) Bolio contributed nothing to the down payments on either house, nothing to the mortgage payments, and nothing to property taxes or insurance. Bolio gave up nothing that reduced the value of the settlement.

As to the lack of probable cause concerning this, there is also express testimony from Lanz's attorney John Mavredakis, whose declaration was as follows: "Based on the allegations of the cross-complaint, it was clear to me that Goldstone had conducted little or no legal research prior to filing the cross-complaint. Within minutes of reviewing the annotations to *Rule of Professional Conduct 3-300,* published in West's Annotated

---

[6] Indeed, in 2008, Division One of this court held that noncompliance with Rules of Professional Conduct, rule 3-300 did not invalidate a contingent fee agreement or "preclude[] an attorney from recovering [the agreement's] specified contractual fee." (*Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1522–1523.)

23

Codes, I found *Plummer v. Day/Eisenberg (2010) 184 Cal.App.4th 38* which conclusively holds that *Rule 3-300* does not apply to a contingent fee agreement. I also reviewed *Marvin vs Marvin (1976) 18 Cal.3rd 660* which holds, in the second paragraph of the first page of the opinion, that the provisions of the Family Law Act do not govern the distribution of property acquired during a non-marital relationship. I found no settle and sue case in which a plaintiff prevailed. [¶] Goldstone later confirmed to me his lack of legal research prior to filing the cross-complaint. During a telephone conversation I had with Goldstone on or about May 11, 2013, Goldstone confessed that he had not known of the *Plummer vs. Day/Eisenberg* case prior to filing the cross-complaint."

Bolio's breach of fiduciary claim also accused Lanz of violating Business and Professions Code section 6147, subdivision (a)(4). This, too, could not be supported, as that section requires that a contingent fee agreement include "a statement that the fee is not set by law but . . . negotiable between attorney and client." Lanz's fee agreement here did just that.

As to the claim as to the inadequacy of the settlement, as Goldstone's anti-SLAPP motion conceded, the most Bolio could have recovered in her *Marvin* action was that she was "arguably entitled to half of all of Ronchelli's property." Bolio, a CPA—and ostensibly a person who would be aware of Ronchelli's assets after 18 years together—agreed on the third day of trial to a settlement by which she received $10,000 and the Modesto house free and clear. Despite that, Goldstone asserted that there was a "significant difference between what the settlement was and [the most Bolio] would have gotten at trial: half of Ronchelli's net worth."

To begin with, there is no evidence in the record that Bolio ever told Goldstone what Ronchelli's net worth was, Goldstone's unsupported representation notwithstanding. Beyond that, there is certainly an issue as to whether Goldstone could have reasonably believed Bolio's estimate that Ronchelli's net worth was more than $1,000,000, and at the same time reasonably believed that Ronchelli's Modesto house was worth no more than $80,000. Indeed, after subtraction of the $106,000 unpaid

24

mortgage balance from Bolio's $80,000 valuation, Ronchelli's equity in the Modesto house would amount to a negative $26,000.

We add one final observation about the allegations in the cross-complaint, this, the specific accusation that Lanz acted with "moral turpitude." As interpreted by the cases, the definition of an "act of moral turpitude" includes that it is an act "contrary to honesty and good morals" (*Stanford v. The State Bar of California* (1940) 15 Cal.2d 721, 728); it is something done "contrary to justice, honesty, or good morals." (*Jacobs v. State Bar of California* (1933) 219 Cal. 59, 64.) Whatever the definition of "moral turpitude," it is a serious charge, as witness Business and Professions Code section 6106, which provides that the commission by an attorney of an act involving moral turpitude may constitute a cause for disbarment or suspension. That is quite a charge to put in a public record.

Superimposed on all the above is that until the cross-complaint, there was no whiff of any claim that Lanz had done anything wrong. Bolio's lengthy e-mail to Lanz on September 9, 2010 said nothing, nor did her four-page declaration prepared by Goldstone in February 2011. It was as if the cross-complaint came out of thin air.

### C.  Malice

The final question is whether Lanz showed a probability of prevailing on the third element of his malicious prosecution claim, malice.

Malice in connection with malicious prosecution " 'relates to the *subjective intent or purpose* with which the defendant acted . . . .' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292.) Malice " 'may range anywhere from open hostility to indifference' "; it is not limited to " 'ill will toward plaintiff but exists when the proceedings are [prosecuted] primarily for an improper purpose.' " (*Ibid.*; accord, *Sierra Club, supra,* 72 Cal.App.4th at p. 1157.) As an element of malicious prosecution, malice "reflects the core function of the tort, which is to secure compensation for harm inflicted by misusing the judicial system, i.e., using it for something other than to enforce legitimate rights and secure remedies to which the claimant may tenably claim an entitlement." (*Drummond v. Desmarais* (2009) 176 Cal.App.4th 439, 451–452, italics omitted.)

As *Sierra Club* elaborated: "Suits with the hallmark of an improper purpose are those in which: ' " . . . (1) the person initiating them does not believe that his claim may be held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated solely for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; (4) the proceedings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim." ' [Citation.]" (*Sierra Club, supra,* 72 Cal.App.4th at p. 1157.)

Since malice concerns actual mental state, it necessarily presents a question of fact. (*Sheldon Appel, supra,* 47 Cal.3d at p. 874.) Particularly apt here—a SLAPP case with its reverse-summary-judgment analysis—is this observation by the dissenting justice in *Crowley*: "malice is such a highly factual issue that it often precludes summary disposition." (*Crowley, supra,* 8 Cal.4th at p. 696 [Arabian, J., dissenting].) Indeed it does, especially here, where the record contains abundant evidence to support Lanz on the issue of malice.

We begin with Goldstone's early threat to Lanz, on February 14, 2011, threatening to file the enclosed cross-complaint unless Lanz gave up on his claim against Bolio. There is nothing in the record—not in Goldstone's declaration, not in Bolio's—indicating that he had any basis to make that threat. There is no evidence he did any research. No evidence he reviewed any material. Indeed, no evidence he even talked to his new client Bolio.

Goldstone was asked at deposition about this threat, if he recalled "a conversation with Mr. Lanz in his office where you told Mr. Lanz that you were prepared to file the cross-complaint unless he dismissed his complaint against Bolio and walked away from his fees and costs?" This was Goldstone's response: "I may have said that to him. That's a possibility, but I don't recall a specific conversation. It was a negotiation tactic that—something that I very well might have said."

There is also the evidence of "bad blood" (to use Goldstone's own words) that he told Lanz's new attorney Mavredakis about, in Goldstone's April 25, 2011 letter: "Mr. Mavredakis, I understand that you are new to this case and that the sins of the client

26

should not be visited upon his attorney. However, there is bad blood here, and my extension of the time limits here is certainly far more conciliatory and generous than anything we have had from the [LANZ] side, thus far."

There is also no evidence that Goldstone did anything to research the applicable law before making the serious charges of ethical violations alleged against Lanz, lack of which indicates "a degree of indifference from which one could . . . infer malice." (*Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1409; see *Sheldon Appel, supra,* 47 Cal.3d at p. 883 ["if the trial court determines that the prior action was not objectively tenable, the extent of a defendant attorney's investigation and research may be relevant to the further question of whether or not the attorney acted with malice"].)

There is also the direct evidence from Lanz that in February, 2011, Goldstone met with him and made a number of thinly veiled threats of protracted and costly litigation unless Lanz agreed to dismiss his claims against Bolio for no money. After reminding Lanz that he was uninsured and would need to defend the cross-complaint at his own expense, Goldstone told Lanz he would not agree to binding arbitration, that he wanted to preserve the threat of appealing any judgment.

Then, a few weeks later, Goldstone sent Lanz's newly retained counsel Mavredakis an e-mail stating that Lanz was "well aware of [Goldstone's settlement] position" and unless Lanz was willing to "tru[ly] compromise," Goldstone was "quite willing to take [the matter] through trial." As one Court of Appeal described it, "Taken together, all of these statements raise a strong inference that [Goldstone's] goal in the ongoing litigation was not to resolve genuine legal disputes, but to push [Lanz] into a settlement." (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1544; see also *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 218 [combination of "frivolous" claim, failure to conduct meaningful discovery, and an attempt to "squeeze a settlement . . . on a baseless case" sufficient evidence of malice to defeat anti-SLAPP motion].)

Finally, there is all the evidence that Judge Wick cited as to Bolio's own ill will toward Lanz. While the motives of the client are not imputable to Goldstone, he has done nothing to disassociate himself from it.[7]

Goldstone several times notes that the cross-complaint was mandatory. Even if it was, it is of no significance, as the California Supreme Court has expressly held: "It is further of no significance that the contents of a cross-pleading may allege a transactional counterclaim as defendants contend in this case. Even if this were true Bertero was still compelled to defend against a possible $104,000 judgment and he was potentially subjected to liability for additional attorney fees as well as to the fears and traumas attendant to defendant status. The contention that defendants were compelled to assert their cause of action under threat of being deemed to have waived it is not responsive to the issue. A litigant is never compelled to file a malicious and fabricated action. It is not the assertion of a claim that is actionable but rather the malicious character of the assertion." (*Bertero, supra,* 13 Cal.3d at p. 52.)[8]

## DISPOSITION

The order denying the anti-SLAPP motion is affirmed. Lanz shall recover his costs on appeal.

---

[7] Save possibly with this footnote, a footnote that Lanz describes as "ignoble": "Notably, to the extent there was in fact ill will or bad blood between Bolio and LANZ, it would be improper to impute Bolio's alleged malice to GOLDSTONE. (See *Zeavin, supra,* 136 Cal.App.3d at p. 773 ['the attorney is not the insurer of his client's conduct, and the law wisely places no such burden on that party's attorney solely by reason of his client's conduct. . .'].)"

[8] Lanz filed a motion for sanctions and a request for judicial notice, both of which are denied.

                                                 _____

                                                 Richman, Acting P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

A141694; *Lanz v. Goldstone*

| | |
|---|---|
| Trial Court: | Sonoma County Superior Court |
| Trial Judge: | Honorable Gary Nadler |
| Attorneys for Plaintiff and Respondent: | Law Office of John J. Mavredakis, John J. Mavredakis |
| Attorneys for Defendant and Appellant: | Murphy, Pearson, Bradley & Feeney, Harlan B. Watkins, Arthur J. Harris |