Filed 12/28/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CHARLES JENKINS et al., Plaintiffs and Respondents, v. SUSAN BRANDT-HAWLEY et al., Defendants and Appellants. | A162852 (Marin County Super. Ct. No. CIV 2002924) |

In 2017, plaintiffs Charles and Ellen Jenkins (the Jenkinses) bought a residential property in the town of San Anselmo (Town). The property had a one-bedroom home with a converted attic, built in 1909, and a small accessory cottage. Following conversations with an architect and contractors, and a meeting with the Town Planning Director, the Jenkinses filed an application for permits to authorize the demolition of the existing structures and the development of a new home with a small, detached studio. The Planning Commission approved the project, but the Jenkinses nevertheless worked with some neighbors to accommodate their concerns, and submitted revised plans, which were also approved at subsequent Planning Commission meetings.

Representing themselves, four individuals filed an appeal to the Town Council which, following a lengthy hearing, denied the appeal.

Following denial of the appeal, a petition for writ of mandamus was filed on behalf of two petitioners: Save Historic San Anselmo, an

1

unincorporated association, and an individual. They were represented by Susan Brandt-Hawley (Ms. Brandt-Hawley), a prominent lawyer with an extensive background in CEQA-related matters, and her firm. The petition alleged two causes of action, the first for "violations of the California Environmental Quality Act" (CEQA), this despite that the appeal did not include any CEQA claim—not to mention that CEQA has a categorical exemption for single-family homes. The second, styled "violation of the Town Municipal Code," alleged in six conclusory lines, without citation, that approval of the project violated the Municipal Code and the Town's General Plan.

An attorney for the Jenkinses sent Ms. Brandt-Hawley a five-page single-spaced letter advising that the petition was frivolous, identifying ten reasons why, observing that "in [his] over 25 years of litigating CEQA actions, [he could not] recall handling a CEQA challenge that appeared this meritless." The letter ended with the request that petitioners "reconsider their current course of action and dismiss this lawsuit, with an agreement that all parties will bear their own costs."

The writ petition came on for hearing before an experienced trial judge (the Honorable Andrew Sweet), who easily denied the petition in a thorough order that, among other things, criticized aspects of Ms. Brandt-Hawley's briefing and advocacy. Petitioners appealed, and along the way sought a writ of supersedeas (which they immediately dismissed), and then offered to dismiss the appeal for a waiver of fees and costs, an offer the Jenkinses rejected. Then, on the day petitioners' opening brief was due, Ms. Brandt-Hawley dismissed the appeal.

The Jenkinses filed a complaint against Ms. Brandt-Hawley and her firm for malicious prosecution. They responded with a special anti-SLAPP

motion to strike, which came on for hearing before a different trial judge (the Honorable James Chou), who, in an equally thorough order, denied the motion, concluding that the Jenkinses had met their burden under step two of the anti-SLAPP procedure demonstrating a probability of success on their complaint.

Our de novo review leads to the same conclusion, and we affirm.

## BACKGROUND

### The General Setting: The Property, the Plans, and the Approvals

In 2017, Charles and Ellen Jenkins, husband and wife, bought the property located at 260 Crescent Road, San Anselmo, where they planned to retire (the property). The property had two structures on it: a one-bedroom "Craftsman" style shingled bungalow built in 1909 (the main house) and a small cottage, partially over a garage, built sometime later. Around the time of their purchase, the Jenkinses spoke with architect Ken Linsteadt and two contractors regarding options for the property, all of whom advised that the main house was not worth saving, for numerous reasons. Mr. Linsteadt also advised that any addition at the back of the house would be undesirable, both aesthetically and in terms of design and proportion, essentially advising that the main house had to be torn down and rebuilt.

Mr. Linsteadt recommended that before the Jenkinses embarked on the design for a new house, they first make sure the house had not been designated as "historic" by the Town. The Jenkinses followed the advice and met with the Town Planning Director Elise Simonian. Simonian then came to the property, examined the main house, and advised that the Town did not have a list or registry of historic houses; she also said she was authorized to determine which houses needed an historic report in order to be rebuilt, and that the Jenkinses's house did not have sufficient architectural detail to

3

require such a report. Finally, Ms. Simonian confirmed what Mr. Linsteadt and the contractors had noted: the main house would have to be largely rebuilt to conform to the relevant building code requirements.

On December 11, 2017, the Jenkinses filed an application with the Town for permits to authorize the demolition of the existing structures and the development of a new three-bedroom, two-and-a-half bath house with a small, detached studio. The project would increase the total square footage from 2,882 square feet to 3,227.5 square feet, a less than 12 percent increase in overall square footage. The project was fully compliant with the existing zoning and building codes, a fact the Jenkinses confirmed with staff at the Planning Department.

In January 2018, the Jenkinses learned that the planning staff had completed its review of the original design and were preparing a report that, subject to a few conditions, recommended approval of the project by the Planning Commission, which was to meet on February 12. Among other things, the planning staff report found the project was categorically exempt from CEQA for new construction of a single-family residence (Cal. Code Regs., tit. 14, §§ 15303(a) and 15300.2); that there were no "historic resource" exceptions to this exemption and the "residence is not historically significant"; and that the design was compatible with the character of development in the neighborhood. The staff report concluded a demolition permit should issue because the existing residence needs to be "significantly demolished and modified to bring it up to modern building codes"; and "[t]he structure would not qualify for state or federal historic listing . . . and the structure does not rise to local historic status and does not have significant historic, cultural or aesthetic value."

4

The Jenkinses discussed the original design with neighbors across the street, at 275 and 271 Crescent Road, as well as another neighbor at 256 Crescent Road.  They also spoke with the former owner of the property, who had lived there for decades.  All expressed their approval of, and their support for, the original design.  However, other neighbors, primarily those living on Woodland Avenue (the "Woodland neighbors"), had objections to the original design, claiming that the proposed new house would not fit in with the neighborhood and would be too tall and intrude on their privacy.  While the Jenkinses believed that the objections were misplaced, in an effort to assuage the Woodland neighbors' concerns, they offered to plant an evergreen hedge that would provide another measure of privacy for them.

On February 12, the Planning Commission met.  A few neighbors raised concerns regarding the height and size of the proposed house, some privacy issues, and setback of the proposed accessory unit from the property line.  The Planning Commission liked the design but, noting the Woodland neighbors' objections, suggested the Jenkinses make some modifications to the house.

Following the hearing, the Jenkinses met with some neighbors and worked with Mr. Linsteadt to revise the plans to address as many of the concerns as feasible.  Mr. Linsteadt prepared revised plans that reduced the overall floor area; reduced the height of the house by an additional 18 inches, from 28 feet nine inches to 27 feet three inches;[1] reduced the accessory unit to a single story; increased the setback of the back cottage from two feet to five

---

[1] The Town Ordinance allows heights up to 30 feet.

feet from the property line; and reduced the size of the second story deck, replacing the roof with a wood trellis.[2]

The Planning Commission was scheduled to meet on March 5, prior to which the planning staff report again recommended approval, this time of the revised plans. The staff report described the changes, and again concluded that the revised design complied with the General Plan and the Municipal Code and that the project was categorically exempt under CEQA and was not historically significant.

At the March 5 hearing, a few neighbors raised the same objections as at the February 12 hearing. The Planning Commissioners essentially responded that "[t]his project has done enough to address the concerns of the neighbors around them." Commissioners noted among other things that the project was "elegant," "well-designed," and fit in with the neighborhood, one noting that "[t]hese are huge setbacks beyond what we require. . ."; "I believe there is more space than what the houses along Woodland have from each other. . . ." The commissioners discussed whether the existing home was historically significant, concurring with the staff report conclusion that it was not, stating among other things that the structures proposed for demolition were "not historic," had "no historic value," and were "nothing special . . . architecturally." And at the conclusion of the meeting the Planning Commission unanimously approved the revised design and the staff report by a vote of six-zero.

As to what happened next, we quote four paragraphs from a later-filed declaration of Charles Jenkins (all citations omitted):

---

[2] The only change requested by the neighbors that was not made was to excavate further than proposed, as the Jenkinses's engineer said the excavation would cause drainage problems.

"Shortly thereafter, and notwithstanding all of our efforts to resolve their issues, the objecting neighbors advised that they would appeal the Planning Commission's approval of the now revised project to the Town Council unless we acceded to a list of five new changes. They also advised that they would refuse to communicate with us directly unless we first agreed to all of their demands. [Citations.] Because the revised design complied with the relevant building codes, and because we had done everything reasonably possible to address their previously stated privacy concerns, we declined the objecting neighbors' request to further revise the plans.

"About a week after the Planning Commission approved the project, the owners of the house across the street from us sent a letter dated March 12, 2018, to the Planning Commission asserting that the Town should require an 'Historic Resource Analysis' for the existing Property before the Town could approve a categorical exemption from CEQA. [Citation.] This letter was the first time I recall any neighbor raising a concern about the Property being potentially historic or suggesting that the Town should not approve a categorical exemption from CEQA. [Citations.]

"Planning Director Elise Simonian stated that the Planning Commission had considered the allegedly historic nature of the residence at both hearings. [Citations.] She indicated that the site was not associated with any events that have made a significant contribution to the broad patterns of local or regional history, or with lives of persons important to local, state, or national history. [Citation.] She also stated that the site did not embody the characteristics of a type, period, region, or method of construction or represent the work of a master. [Citation.] In short, Ms. Simonian opined that the site does not meet the criteria for designating a historic resource as it had not yielded, and does not have the potential to

7

yield, information important to the history of the local area, the state, or the nation. [Citation.] Ms. Simonian advised the appellants that the Jenkinses "*would be happy to speak with [appellants] regarding the project.*" [Citation.] In fact, we had asked Town staff to provide our phone numbers and contact information to the objecting neighbors, and we said that we would welcome discussion with the neighbors. [Citations.] However, the Woodland Neighbors stated that they would 'not be reaching out to [us] as [staff] suggest[s],' indicating that they simply wanted confirmation that 'the changes will be made' and would otherwise be 'going ahead with the appeal process.' [Citations.]

"The objecting neighbors moved forward with their plan and appealed the Planning Commission's approval of the revised project to the San Anselmo Town Council."[3]

**The Appeal to the Town Council**

On March 15, representing themselves, four individuals—Chris and Kassie Livermore, Ani Wade, and Patrick Bennett—filed an administrative appeal. The appeal requested "the Town Council reviews this project for the following reasons," all set forth in bold-face: (1) "the project is out of character with the neighborhood in its scale and style"; (2) "there are privacy issues for four adjacent neighbors which have not been addressed"; (3) "there were procedural missteps in the process"; and (4) "the neighborhood impact during construction was not considered." Under the first bold-faced item, in

---

[3] A third meeting was held on April 2, where the Planning Commission heard the Jenkinses's application for a grading permit. Again some neighbors expressed concern about the claimed historic nature of the house and compliance with the Municipal Code. The Planning Commission granted the grading permit.

the last of five paragraphs, was this: "[t]here is also a major concern amongst the neighbors, regarding the historic value of the existing home. Although planning staff performed their own 'historic evaluation,' there is significant information about the home that leads the neighborhood to believe the existing house merits an independent Historic Resource Analysis."

The appeal was scheduled to be heard on June 26 before the Town Council, prior to which its staff prepared a voluminous, 23-page, single-spaced report for the Council (council staff report). The council staff report included: (1) a detailed discussion of the history of the property; (2) an analysis explaining that the property is not one of the "presumptive" types of historical properties under CEQA because it was not found to be eligible for listing in the California Register of Historical Resources and not identified as significant in a historical resource survey; (3) an analysis explaining that CEQA gives the Town Council discretion regarding the designation of a property as historical; and (4) an analysis explaining that, although the Town had in the 1980s conducted an inventory of potentially historic properties (where the property was one of 313 properties identified), the Town Council never ultimately adopted or approved that inventory, going on to note that many of those 313 properties had since been demolished, redeveloped, or otherwise altered. Despite all that, in light of the neighbors' questions, the council staff report recommended a historic resource evaluation (HRE).

The Jenkinses retained Page & Turnbull, an established architecture and preservation firm, to prepare an HRE. The firm made an extensive analysis of the history of the property and prepared an HRE that concluded the property was not eligible for listing in the California Register and was not an historic resource under CEQA. The HRE was submitted to the Town Council in advance of the hearing on the appeal.

9

The appeal came on for hearing on June 26, where the Town Council considered all material, including the council staff report and the expert Page & Turnbull report. The Town Council voted to uphold the Planning Commission's approval of the project and its findings, including the finding that the property "does not rise to local historic status and does not have significant historic, cultural or aesthetic value." The Town Council also affirmed the Planning Commission's CEQA determination that the replacement single family home project was categorically exempt from CRQA's detailed and elaborate environmental analytical and processing mandates such as an EIR. As Judge Chou would later describe it—following six-pages of quotations from the staff council report and Planning Director's Simonian's comments—"the Town Council discussed the project at length, including the historical nature of the property, and voted 3-1 to deny the appeal."

Soon after Ms. Brandt-Hawley entered the picture.

**The Petition for Writ of Mandamus and the Appeal**

On August 10, some six weeks after the Town Council approved the project, a verified petition for writ of mandamus was filed on behalf of two plaintiffs: Save Historic San Anselmo, an unincorporated association, and Laurel Mellin. The petition was filed by Ms. Brandt-Hawley and her law firm, Brandt-Hawley Law Group.[4] The petition alleged two causes of action,

---

[4] Ms. Brandt-Hawley is a most experienced attorney, described in the opening brief this way: "Susan Brandt-Hawley has been a California attorney for more than 40 years. [Citation.] She is currently an elected member of the California Academy of Appellate Lawyers [citation], and since 1999, she has served as an invited co-faculty member on CEQA for the Center for Judicial Education and Research and the California Judicial Studies Program. [Citation.] Brandt-Hawley has successfully represented

10

styled in bold-face as follows: (1) "violations of [CEQA]," and (2) "violations of the Town Municipal Code." The second cause of action, though entitled "Municipal Code," also included a claimed violation of the "General Plan," both claimed violations conclusorily described in a total of six-lines, failing to identify any provision of the Municipal Code or the General Plan. Shortly thereafter, Ms. Brandt-Hawley filed a verified First Amended Petition that, while adding slightly more detail to the allegations, still failed to clearly state the claimed bases for the second cause of action.

On October 25, on behalf of the Jenkinses, attorney Rick Jarvis sent Ms. Brandt-Hawley a five-page, single-spaced letter that he called a "meet and confer" letter under Code of Civil Procedure sections 128.5 and 128.7, asserting that in his view the writ petition was frivolous, stating that "the claims asserted appear to be completely without merit and presented primarily or solely for the improper purpose of harassing [the Jenkinses] (e.g., intending that the cost of litigation will dissuade them from proceeding)." Mr. Jarvis's letter specifically identified no fewer than 10 problems with the petition, including these:

- That the home of plaintiff Mellin (built in 1911) had been substantially remodeled without any historical impact analysis, and that a home at 132 Woodland (which also appeared on the 1980s inventory) had recently "had its entire exterior removed and [was] in the process of being redeveloped without any historic analysis";
- That the Jenkinses's new home would be consistent with other homes in the neighborhood;

---

public interest groups in CEQA litigation, with a particular focus on historic preservation issues. [Citation.]" An impressive record indeed.

- That the neighbors' objections to the project were ever-changing, but, in their latest form, were impossible as a matter of engineering;

- That the Town had wide discretion to approve the project and had clearly done so based on substantial evidence;

- That the Town had found, based on the evidence presented, that "the structure does not rise to local historic status and does not have significant historic, cultural, or aesthetic value";

- That the standard of review was "substantial evidence," and that the petition's contention that a "fair argument" supported Ms. Brandt-Hawley's clients' position in administrative proceedings could not possibly support the claims in her lawsuit;

- That the Page & Turnbull study constituted "substantial evidence" supporting the Town's findings of insufficient "local historical status" and "historic, cultural, or aesthetic value," as did the report and recommendations of the Planning Commission staff;

- That the verified allegation that the Planning Director "recommended" an independent study other than the Page & Turnbull report was a misrepresentation: that the Director had instead merely stated that the Town had the alternative of requesting an independent study;

- That the "mitigation measures" argument for the application of CEQA had never been raised in the underlying administrative proceedings, which foreclosed her from presenting it in the trial court; and

- That even if the claim had been raised in the administrative proceedings, "an unbroken line of CEQA caselaw establishes that visual impacts to neighboring properties are not environmental impacts subject to CEQA in the first place," citing *Association for Protection of Environmental Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 734; *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492; and *Eureka Citizens for Responsible Growth v. City of Eureka* (2007) 147 Cal.App.4th 357, 376.

Mr. Jarvis's letter ended with this paragraph: "Thus, the allegations in your amended petition, taken together with the surrounding circumstances of this project, leave both me and my clients with the strong impression that the present action is frivolous and improperly harassing. Indeed, in my over 25 years of litigating CEQA actions, I cannot recall handling a CEQA challenge that appeared this meritless. My clients request that Petitioners reconsider their current course of action and dismiss this lawsuit, with an agreement that all parties will bear their own costs."

Ms. Brandt-Hawley did not respond in writing to Mr. Jarvis's letter. In a later filed declaration she would say she had "telephone conversations with [Mr. Jarvis] why [she] held a different legal opinion"—never, we might add, saying anything about any of the *facts*.

On December 26, Mr. Jarvis filed an answer on behalf of the Jenkinses, which answer also asserted that the petition was meritless as a matter of fact and a matter of law. Among other things, the answer alleged as a sixth affirmative defense estoppel, that Mellin, her predecessors, and other neighbors had substantially redeveloped homes without any CEQA review or historic analysis (despite that many, including 132 Woodland, appeared on

13

the 1980s inventory that Ms. Brandt-Hawley relied on to support much of her case), and that Ms. Brandt-Hawley's "historic resource concerns" had not been raised before the Planning Commission, but had instead been raised for the first time before the Town Council, in a last-ditch effort to stop or delay the Jenkinses's project. The seventh affirmative defense, styled "frivolous action," asserted that the lawsuit was frivolous under Code of Civil Procedure sections 128.5 and 128.7.

Ms. Brandt-Hawley filed her brief on the petition, asserting three main arguments in this order: (1) the approval of the project violated Town Municipal Code section 10-3.1305(e); (2) the approval of the project violated provisions of the Town's General Plan stating a policy of preserving historically and significant structures; and (3) the Town had incorrectly approved the project based on its conclusion that the project was categorically exempt from CEQA while adopting "mitigation measures" that foreclosed a categorical exemption.

The petition came on for hearing before Judge Sweet, who on April 22, filed his order, a comprehensive 33-page ruling denying the petition. The order began with an exhaustive 15-page discussion of the background. Then, after setting forth the standard of review, Judge Sweet began with preliminary observations, including these: Referring to the Jenkinses's argument that it was Ms. Brandt-Hawley's "burden to affirmatively show there was no substantial evidence in the entire record to support the Town's findings and conclusions," Judge Sweet noted that Ms. Brandt-Hawley was required to "lay out the evidence favorable to the other side and show why it is lacking," and that "[f]ailure to do so is fatal." And he went on to note, "[e]xcept for brief references to expressions by councilmembers [of] differing views on the issue of historical significance [citation], petitioners do not [lay]

14

out all the evidence in the record that supports the Town's findings; e.g., the opening brief does not summarize the evidence in the HRE or in the Planning Commission staff reports which found the house is not historically significant."

Judge Sweet then went on to deny the petition on the merits, with these three fundamental conclusions:

(1)     He rejected Ms. Brandt-Hawley's reading of the Town Municipal Code section 10-3.1305(e), holding that the plain language of that section made a finding of hardship optional.

(2)     He rejected Ms. Brandt-Hawley's argument as to the General Plan, holding that the HRE, the Planning Commission staff report, and the finding that the old house "[did] not rise to local historic status and [did] not have significant historic, cultural or aesthetic value" were substantial evidence that requirements of the General Plan had been satisfied.

(3)     He rejected Ms. Brandt-Hawley's CEQA argument, holding that it had not been raised in the administrative proceedings; that Ms. Brandt-Hawley had repeatedly not supplied *any* record reference for her argument or pointed to *any* discussion showing the Town was aware of the nature of her "mitigation measures" argument; and that her proposed rule would "nullify the exhaustion of remedies requirement." Beyond all that, he noted that if he "were to reach the merits of this claim, the court would find the measures at issue are not mitigation measures required by CEQA," but rather design features and components of the project itself not subject to CEQA.

Judge Sweet stayed his order until April 25. But instead of appealing or filing a motion to stay in that time, on May 29 Ms. Brandt-Hawley filed a notice of appeal. Then, in mid-June, after hearing that the Jenkinses had received a demolition permit, she filed a petition for writ of supersedeas

15

seeking an emergency stay, a petition that did nothing more than reargue the arguments rejected below, giving short shrift—one sentence—to Judge Sweet's comprehensive order. Following correspondence from Mr. Jarvis, Ms. Brandt-Hawley withdrew the petition that same day. On August 12, Ms. Brandt-Hawley offered to dismiss the appeal if the Jenkinses would "waive[] recovery of their fees and costs." The Jenkinses declined. On September 6—the day her opening brief was due—Ms. Brandt-Hawley voluntarily dismissed the appeal.

**The Jenkinses File Suit For Malicious Prosecution**

On September 30, the Jenkinses filed a complaint naming as defendants Ms. Brandt-Hawley and her firm, Brandt-Hawley Law Group (when referred to collectively, Brandt-Hawley). It alleged one cause of action, for malicious prosecution.

On February 9, 2021, Brandt-Hawley filed a special motion to strike the complaint under Code of Civil Procedure section 425.16 (SLAPP or anti-SLAPP motion). Brandt-Hawley also filed a request for judicial notice seeking judicial notice of the register of actions in *Save Historic San Anselmo v. Town of San Anselmo* (Super. Ct. Marin County, 2018, No. 2826), including 986 pages from the administrative record.

The SLAPP motion was accompanied by two declarations of: (1) Jeff Kroot, one of the members of Save Historic San Anselmo, and (2) Ms. Brandt-Hawley. Ms. Brandt-Hawley's declaration began with four pages of her "professional background," which included testimony describing her reputation, her awards, her teaching, and her experience; it also included a listing of 23 reported cases she handled in the California Supreme Court and various Appellate Courts. There followed her description of her "Representation of Save Historic San Anselmo and Dr. Laurel Mellin." And

16

the declaration ended with five pages, containing 10 paragraphs, under the heading "Probable Cause Supported the Litigation."

On April 22, the Jenkinses filed their opposition, which included four declarations of: Charles Jenkins, Ellen Jenkins, Mr. Jarvis, and Jennifer L. Hernandez, the last person an attorney in private practice with more than 30 years of experience in the practice of land and environmental law. The Jenkinses also filed a request for judicial notice of 10 exhibits, consisting of over 700 pages.

Mr. Jenkins's declaration testified he had reviewed the petition and amended petition that "Ms. Brandt-Hawley personally verified . . . under penalty of perjury," which petitions "were misleading as to material facts." As we discuss in some detail below, Mr. Jenkins went on to list nine specific passages that he testified were "misleading." Mr. Jenkins also testified that Ms. Brandt-Hawley "made material misrepresentations at the hearing on the writ petition," going on to identify five specific misrepresentations.

On April 28, Brandt-Hawley filed a reply memorandum and also a declaration of Paul Clifford, an attorney representing them. There was no supplemental declaration from Ms. Brandt-Hawley—nothing taking issue with anything said in Mr. Jenkins's declaration.

The anti-SLAPP motion came on for hearing on May 12, before the Honorable James Chou, prior to which he had issued a tentative ruling denying the motion. At the conclusion of the hearing, Judge Chou adopted his tentative ruling and thereafter filed an order formally adopting the tentative ruling, attached to which was a detailed, 20-page analysis explaining his ruling, which concluded the Jenkinses had met their burden under step two of the anti-SLAPP analysis, demonstrating a probability of prevailing on their claim for malicious prosecution. As to the issue of

17

probable cause, Judge Chou examined each of the three claims against the Jenkinses separately, and concluded the Jenkinses had satisfied their burden of showing a probability of success, demonstrating that two of the claims, those regarding the Municipal Code and CEQA, were legally untenable. He also found that the Jenkinses had met their burden on the issue of malice.[5]

On June 7, Brandt-Hawley filed a notice of appeal.

## DISCUSSION

### The Law of Anti-SLAPP

In *Lanz v. Goldstone* (2015) 243 Cal.App.4th 441 (*Goldstone*), we addressed an appeal in a setting identical to that here: plaintiff filed a complaint that alleged one count for malicious prosecution; defendant filed an anti-SLAPP motion; the trial court denied it, concluding that plaintiff had met his burden of probability of success; and defendant appealed. In short, the setting in *Goldstone* was identical to that here, and provides a perfect template for our analysis, and we thus begin with extensive quotation from *Goldstone*, with minor edits to accommodate the setting here:

"*SLAPP Law and the Standard of Review*

"Subdivision (b)(1) of section 425.16 of the Code of Civil Procedure provides that '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that

---

[5] Judge Chou found against the Jenkinses on the issue of probable cause as to the claim based on the general plan; he also granted the requests for Judicial Notice and sustained Ms. Brandt-Hawley's objection to the Hernandez declaration.

the plaintiff will prevail on the claim.' Subdivision (e) of section 425.16 elaborates the four types of acts within the ambit of a SLAPP.

"A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the acts underlying the plaintiff's complaint fit one of the categories spelled out in Code of Civil Procedure section 425.16, subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

"Here, the parties agreed that the [Jenkinses's] malicious prosecution case came within the first step of the anti-SLAPP analysis. (See *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 215 ['The plain language of the anti-SLAPP statute dictates that every claim of malicious prosecution is a cause of action arising from protected activity because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding'].)

"So, . . . [Judge Chou's] analysis addressed only the second step in the SLAPP analysis, as will we. And as to how we decide that step, we set forth the governing law in *Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 989–990 (*Grewal*):

" 'We decide the second step of the anti-SLAPP analysis on consideration of "the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b).) Looking at those affidavits, "[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to

19

determine if it defeats the plaintiff's submission as a matter of law." (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700.)

" 'That is the setting in which we determine whether plaintiff has met the required showing, a showing that is "not high." (*Overstock.com, Inc. v. Gradient Analytics, Inc., supra*, 151 Cal.App.4th at p. 699.) In the words of the Supreme Court, plaintiff needs to show only a "minimum level of legal sufficiency and triability." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438, fn. 5.) In the words of other courts, plaintiff needs to show only a case of "minimal merit." (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 675, quoting *Navellier*[, *supra*,] 29 Cal.4th 82, 95, fn. 11.)

" '. . . As the Supreme Court early on noted, the anti-SLAPP statute operates like a "motion for summary judgment in 'reverse.' " (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 719.) Or, as that court would later put it, "Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation. [Citation.]" (*Varian Medical Systems, Inc. v. Delfino* [(2005)] 35 Cal.4th [180,] 192; accord, *Taus v. Loftus* (2007) 40 Cal.4th 683, 714.)

" 'Numerous Courts of Appeal have articulated the test in similar language. (See *Tichinin v. City of Morgan Hill* (2009) 177 Cal.App.4th 1049, 1062 ["a standard 'similar to that employed in determining nonsuit, directed verdict or summary judgment motions' "]; *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 317 ["plaintiff's burden as to the second prong of the anti-SLAPP test is akin to that of a party opposing a motion for summary judgment"][, disapproved on another ground in *Newport Harbor Ventures,*

*LLC v. Morris Cerullo World Evangelism* (2018) 4 Cal.5th 637, 646]; *Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907 ["similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment"].)' (*Grewal, supra*, 191 Cal.App.4th at pp. 989–990.)

"With those principles in mind, we turn to an analysis of whether [the Jenkinses] established a probability that [they] will prevail on [their] claim for malicious prosecution, an analysis we make on de novo review. (*Grewal, supra*, 191 Cal.App.4th at p. 988.)" (*Lanz v. Goldstone, supra*, 243 Cal.App.4th at pp. 456–458.)

### The Jenkinses Demonstrated a Probability of Prevailing on Their Claim for Malicious Prosecution

*The Law of Malicious Prosecution*

"To establish a cause of action for the malicious prosecution of a civil proceeding, a plaintiff must plead and prove that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations]." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 50 (*Bertero*); see CACI No. 1501.)

*Bertero* went on to explain the two reasons why malicious prosecution is actionable: "The malicious commencement of a civil proceeding is actionable because it harms the individual against whom the claim is made, and also because it threatens the efficient administration of justice. The individual is harmed because he is compelled to defend against a fabricated claim which not only subjects him to the panoply of psychological pressures most civil defendants suffer, but also to the additional stress of attempting to resist a suit commenced out of spite or ill will, often magnified by slanderous allegations in the pleadings." (*Bertero, supra*, 13 Cal.3d at pp. 50–51.) And

"[t]he judicial process is adversely affected by a maliciously prosecuted cause not only by the clogging of already crowded dockets, but by the unscrupulous use of the courts by individuals '. . . as instruments with which to maliciously injure their fellow men.' " (*Id.* at p. 51.)

*Bertero* contains one other principle apt here, that if the underlying action contains more than one claim, each claim must be based on probable cause. (*Bertero*, *supra*, 13 Cal.3d at p. 57; accord, *Crowley v. Katleman* (1994) 8 Cal.4th 666, 695; *Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1152–1153.) Put slightly differently, a malicious prosecution cause of action can succeed if any of the claims was brought without probable cause.

Here, there is no issue of element one, favorable termination. The issues are with elements two and three: "without probable cause" and "malice."

### *Without Probable Cause*

"If there is ' "no dispute as to the facts upon which an attorney acted in filing the prior action, the question of whether there was probable cause to institute that action is purely legal." [Citation.] "The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted." [Citation.]' (*Daniels v. Robbins, supra*, 182 Cal.App.4th at p. 222.) So, it is often said that 'the existence or absence of probable cause has traditionally been viewed as a question of law to be determined by the court, rather than a question of fact for the jury. . . . [¶] . . . [It] requires a sensitive evaluation of legal principles and precedents, a task generally beyond the ken of lay jurors . . . .' (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 875 (*Sheldon Appel*).)

"On the other hand, when there is a dispute as to the state of the defendant's knowledge and the existence of probable cause turns on

resolution of that dispute, there becomes a fact question that must be resolved before the court can determine the legal question of probable cause. (See *Sheldon Appel, supra*, 47 Cal.3d at p. 881 ['[T]he jury must determine what facts the defendant knew . . .'].)" (*Lanz v. Goldstone, supra,* 243 Cal.App.4th at p. 462.)

As noted, Judge Chou found that the Jenkinses demonstrated a probability of prevailing on the issue of lack of probable cause as to two of Ms. Brandt-Hawley's claims, that the Municipal Code and CEQA claims were legally untenable. Our de novo review leads to the same conclusion.

The claim in the petition was that the Town violated section 10-3.1305 of the Municipal Code, which provides that before issuing a demolition permit, the Town "must" find that the proposed use will not have certain specified detrimental results. In support of the petition, Ms. Brandt-Hawley argued that the Code also required compliance with section 10-3.1305(e), which provides in its entirety as follows: "Demolitions of Commercial, Professional, and/or Residential Dwelling Structures: The Town will encourage the preservation, maintenance, restoration, rehabilitation, moving or continued use of all structures of historic, cultural, or aesthetic value. The granting or denying of a conditional use permit for the demolition of structures may also be subject to the following findings based on substantial evidence as determined by the Planning Commission or Town Council.

"(1) Failure to approve a demolition permit will cause immediate and substantial hardship because of the conditions peculiar to a particular structure, and such hardship has not been created by an act of the owner in anticipation of action under this chapter. Examples of hardship include health and safety hazards that cause the building to be unsafe. Personal,

23

family, financing difficulties, loss of prospective profits and neighboring violations are not justifiable hardships.

"(2) It is necessary to reveal previous architectural features covered up, such feature that would be functionally and aesthetically compatible with the existing improvements and the natural elements of the area."

The argument is very wrong.

Municipal Code, section 10-3.1305(a) provides that before issuing a demolition permit, the Town "must" find that the proposed use will not have certain specified detrimental results. The Town did that here. While section 10-3.1305(e) identifies further findings that the Town "may also" make when approving a demolition permit, a permissive phrasing that "*may also*" leave the Town with discretion to identify further findings. In short, section 10-3.1305(e) makes an "immediate and substantial hardship" finding optional. (See *Great Lakes Properties, Inc. v. El Segundo* (1977) 19 Cal.3d 152, 155.)

As Judge Chou summed up: the Jenkinses argued, and Judge Sweet agreed, that the hardship language was permissive, not mandatory, given the use of the words "***may also*** be subject to the following findings . . . . [¶] Defendants contended they had probable cause to make their argument because the quoted 'may also' sentence was not even part of the record and was not included in the Town's findings. To the contrary, Defendants argue, Town staff stated in its report that the special finding 'must be made' in this case 'for the demolition of the existing structure.' [¶] The court finds that [the Jenkinses] have satisfied their burden of showing a probability of success on their claim as it pertains to this ground asserted by defendants in the writ petition, and which defendants continued to pursue in their writ of supersedeas. The language of section 10-3.1305(e) is permissive, making the hardship finding discretionary rather than mandatory."

24

Even if section 10-3.1305(e) were ambiguous—and it is not—any reasonable attorney would know that Brandt-Hawley's interpretation would be rejected. It would be unreasonable—and arbitrary—for the Town to prevent itself from ever issuing demolition permits absent "immediate and substantial hardship," no matter the circumstances. (See *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 297–298.) It would also be inconsistent with the rest of the statute, which uses "must," rather than "may," when referring to mandatory filings. (See *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 606–617 [courts consider entire statute and give "significance to every word"].)

Superimposed on all the above is that the Town's interpretation of its own Municipal Code was "entitled to considerable deference." (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2010) 184 Cal.App.4th 1032, 1047.) Brandt-Hawley's failure to demonstrate that the Town had ever required a showing of "immediate and substantial hardship" before approving a demolition permit also undermined her claim.

On top of all that, Ms. Brandt-Hawley's briefing on the issue never quoted the actual text of subdivision (e). Instead, she misleadingly referred the trial court to AR 7 (administrative record), a summary of subdivision (e) referenced in the Town's findings, which summary omitted the word "may." Such failure to present the record fairly supports the inference that Ms. Brandt-Hawley knew the claim was untenable.

But the failure to present the record fairly extended to other items as well. For example, the briefing also made multiple misleading statements, including that Planning Director Simonian had been critical of the HRE, even though the Planning Director had also said the HRE seemed "thorough and complete." The brief asserted that "there is no question that the Town

25

Council was fully informed not just of 'generalized' environmental concerns but of residents' specific objections both to the categorical exemption and to the project's environmental impacts based in part on inadequate mitigation for visual impacts and grading." Yet the brief cited nothing—and the record said otherwise.[6]

Turning to the cause of action in the petition for violations of CEQA, the Jenkinses met their burden on it as well, beginning with the demonstration that the claim would run afoul of established CEQA law requiring exhaustion of administrative remedies. Public Resources Code section 21177 provides that a CEQA petitioner may not challenge a project "unless the alleged grounds for noncompliance . . . were presented to the public agency orally or in writing by any person during the public comment period provided by this division or before the close of the public hearing on the project before the issuance of the notice of determination." (Pub. Resources Code, § 21177, subd. (a).) This principle is not only codified, it exists through case law as well. (*Tomlinson v. County of Alameda* (2012)

---

[6] Some mistreatment of the record continued on appeal, as Brandt-Hawley's opening brief asserts that "the Town did not file a single brief in the underlying litigation, nor did it join in the Respondents' briefing" and that the Jenkinses's opposition brief in the underlying litigation was filed "with no joinder from the Town."

The Jenkinses's brief called Brandt-Hawley on that, citing to the fact that the Town Council, respondents in the petition, did in fact join the Jenkinses in opposition to the petition—indeed, that Ms. Brandt-Hawley even included that "joinder" brief by the Town in the Appellant's Appendix. Furthermore, Town attorney Benjamin Stock attended the proceedings before Judge Sweet, making clear that the Town supported the Jenkinses's position in the petition.

Brandt-Hawley's reply brief attempts to explain how the misstatement came about, and in any event apologizes for the error.

54 Cal.4th 281, 291 [section 21177, subdivision (a)'s exhaustion-of-administrative-remedies requirement "applies to a public agency's decision that a proposed project is categorically exempt from CEQA compliance"]; *Bridges v. Mt. San Jacinto Community College. Dist.* (2017) 14 Cal.App.5th 104, 116.)

To satisfy the exhaustion doctrine, objections cannot be generalized or unelaborated, but rather must be "specific" and involve the "exact issue." As our colleagues in Division One put it, "the requirement of exhaustion is a jurisdictional prerequisite," and "[t]he purposes of the doctrine are not satisfied if the objections are not sufficiently specific so as to allow the Agency the opportunity to evaluate and respond to them," that the "exact issue must have been presented to the administrative agency." (*Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444, 453–459, citations and internal quotation marks omitted; *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 623 ["bland and general references to environmental matters, or isolated and unelaborated comments do not satisfy" the exhaustion requirement].) Here, Judge Sweet, in denying the petition, and Judge Chou, in denying the SLAPP motion, both found that the CEQA claim was clearly barred by this requirement.

As noted, the Town determined that the project fell within a categorical CEQA exemption for single-family residences. (See Cal .Code Regs., tit. 14, § 15303, subd. (a); Pub. Resources Code, § 21084, subd. (a).) In the petition, Brandt-Hawley argued that an exception to this exemption precluded that determination, asserting that the project could not be deemed categorically exempt because it was slightly modified to address neighbors' aesthetic and privacy concerns. However, as both Judge Sweet and Judge Chou found, this argument is nowhere to be found in the administrative record. As Judge

Sweet put it, "[T]here is nothing in these references that indicates the opponents specifically, or even generally, objected to the Town's finding the project is categorically exempt because of the imposition of any mitigation measures." Indeed, Judge Sweet did his own review of the administrative record and did not find "any reference where the project opponents specifically raised this issue when challenging the Town's categorical exemption finding."

Similar to Judge Sweet's analysis, Judge Chou also found that Ms. Brandt-Hawley failed to demonstrate that the CEQA exemption argument was raised before the Town and was thus waived. For this reason alone, the CEQA claim was legally untenable.

But even if the claim had been preserved, it would still fail because any reasonable attorney would conclude that the modifications were not "mitigation measures" under CEQA, as they did not meet either part of the two-part test required by our Supreme Court in a 2015 case in which Ms. Brandt-Hawley was the attorney for plaintiffs—*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086 (*Berkeley Hillside*).

*Berkeley Hillside*, like here, involved a single-family residence, though unlike the simple project here, one involving a 6,478 square-foot home with an attached 3,394 square-foot 10-car garage situated on a steep slope in a heavily wooded area. The plan was supported by neighbors, by the City of Berkeley Planning and Development, and by the City Council. And the City found the categorical exemption under CEQA for a single-family home applied. (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1092, 1093–1096.) Representing the petitioners, Ms. Brandt-Hawley filed a petition that acknowledged the deferential substantial evidence standard of review applied, but contended an exception to the categorical exemption also applied

28

because the project might result in significant environmental impacts due to "unusual circumstances."

The trial court denied the petition. It first concluded that the administrative record contained substantial evidence to support the City's application of the small-structures categorical exemptions. It next found that the unusual circumstances exception (Cal. Code Regs, tit. 14, § 15300.2, subd. (c) (Guidelines)) did not preclude application of those categorical exemptions because, notwithstanding evidence of potential significant environmental effects, the proposed project did not present any unusual circumstances. The Court of Appeal reversed. Citing to "substantial evidence of a fair argument that the proposed project may have a significant environmental impact," the court held that the exemptions the City invoked did not apply, that " 'the fact that the proposed activity may have an effect on the environment is itself an unusual circumstance' that triggers the exception." (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1092–1093, 1096.)

The Supreme Court reversed, concluding that neither the trial court nor the appellate court had correctly analyzed whether unusual circumstances precluded the application of categorical exceptions. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1093.) And the Court established the two-part test to determine whether the "unusual circumstances exception" applies precluding a categorical exemption: under the agency-deferential substantial evidence standard, the petitioner must establish an "unusual circumstance" by showing that a project "has some feature that distinguishes it from others in the exempt class, such as its size or location"; and if "unusual circumstances" are present, the petitioner must also establish that the unusual circumstance gives rise to a "reasonable possibility that the activity will have a significant effect on the environment." (*Id.* at p. 1105.)

29

Brandt-Hawley fails to come close to meeting *Berkeley Hillside's* first burden, showing that no substantial evidence supported the Town's exemption decision, let alone the second, "significant effect on the environment." Ms. Brandt-Hawley has never described a substantial environmental impact that would be caused by the project, not in the petition, not in the anti-SLAPP motion—and not here.

Construction of a "single-family residence" constitutes a categorical exemption from CEQA, and one challenging the applicability of this exemption must overcome the heavy burden of establishing that there is no substantial evidence supporting it, something that Brandt-Hawley was necessarily aware of based on her general experience with CEQA, as well as her specific experience in *Berkeley Hillside*. The record here is filled with substantial evidence in support of the Town's determination that the Jenkinses's single-family residence would be categorically exempt from CEQA, including, for example the Page & Turnbull study, the Town's numerous reports and recommendations, and the opinion of Planning Director Simonian.[7]

The above supports the inference that Ms. Brandt-Hawley knew the claims in the petition were untenable, especially given her extensive CEQA and land use law experience and the law from *Berkeley Hillside*. Despite this, she filed the petition, and pushed on in the face of the detailed letter

---

[7] The Jenkinses argue that Judge Chou erred in his holding that there was probable cause for the claim based on the General Plan, and that this part of his order should be reversed. We do not consider the argument as it is misplaced, the Jenkinses having not filed a cross-appeal. (See *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 585 ["To obtain relief by way of appeal, respondents must themselves file a notice of appeal and become cross-appellants"].)

from Mr. Jarvis. Then, and despite that that petition was easily rejected by Judge Sweet, she nevertheless appealed, then filed a supersedeas petition (which she immediately dismissed), thereafter pressed for a waiver of fees and costs, ultimately to dismiss the appeal.

The remaining issue is whether the Jenkinses showed a probability of prevailing on the third element of their malicious prosecution claim—malice. Like Judge Chou, we conclude they did.

*Malice*

Malice in connection with malicious prosecution " 'relates to the *subjective intent or purpose* with which the defendant acted . . . .' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292 (*Soukup*). As an earlier Supreme Court case put it, the malice required "is not limited to actual hostility or ill will toward plaintiff but exists when the proceedings are instituted primarily for an improper purpose" (*Albertson v. Raboff* (1956) 46 Cal.2d 375, 383, superseded by statute on other grounds as stated in *La Jolla Group II v. Bruce* (2012) 211 Cal.App.4th 461, 473), adding that suits brought with improper purposes include: " '[T]hose in which (1) the person initiating them does not believe that his claim may be held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated solely for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; [or] (4) the proceedings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim.' " (*Ibid.*) In short, malice " 'may range anywhere from open hostility to indifference' "; it is not limited to " 'ill will toward plaintiff but exists when the proceedings are [prosecuted] primarily for an improper purpose.' " (*Soukup*, *supra*, 39 Cal.4th at p. 292.)

31

Since malice concerns mental state, it necessarily presents a question of fact.  (*Sheldon Appel, supra*, 47 Cal.3d at p. 874.)  Particularly apt here, a SLAPP case with its reverse summary judgment analysis, is this observation by the dissenting justice in *Crowley v. Katleman, supra*, 8 Cal.4th at p. 696 (dis. opn. of Arabian, J.):  "malice is such a highly factual issue that it often precludes summary disposition."

Likewise pertinent are the cases recognizing that the evidence supporting malice is usually circumstantial (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 218), a recognition demonstrated by the many cases that have denied anti-SLAPP motions in malicious prosecution cases based on evidence that a party pursued, or continued to pursue, a case after learning it was untenable.  (See, e.g., *Area 55, LLC v. Nicholas & Tomasevic, LLP* (2021) 61 Cal.App.5th 136, 169–171; *Golden State Seafood, Inc. v. Schloss* (2020) 53 Cal.App.5th 21, 38–39; *Cuevas-Martinez v. Sun Salt Sand, Inc.* (2019) 35 Cal.App.5th 1109, 1122; *Olivares v. Pineda* (2019) 40 Cal.App.5th 343, 356–357; *Medley Capital Corp. v. Security National Guaranty, Inc.* (2017) 17 Cal.App.5th 33, 48–50.)

And also pertinent are the cases holding that lack of probable cause may be relevant on the issue of malice, though it is not by itself enough.  (*Dunning v. Clews* (2021) 64 Cal.App.5th 156, 177 (*Dunning*) ["While a lack of probable cause is relevant to the issue of malice, it is insufficient, standing alone, to support a finding of malice"].)

Here, lack of probable cause does not stand alone.  The record contains abundant other evidence, including this:

Shortly after filing the amended writ petition, Ms. Brandt-Hawley was confronted by the accusations in Mr. Jarvis's lengthy letter, and responded only orally, that at some unidentified time she "explained in telephone

32

conversations . . . why I held a different legal opinion." Notably, nothing was said about the *facts* laid out by Mr. Jarvis. This is indifference. (*Soukup*, *supra*, 39 Cal.4th at p. 292.)

As alluded to above, in his declaration Mr. Jenkins pointed to numerous statements by Ms. Brandt-Hawley in the writ petition that he said were "misleading as to material facts," going on to specify nine examples, including the following (all citations omitted):

"At page 1, lines 13–15, she states that the existing one-story house at 260 Crescent Road was 'one of the first houses built in San Anselmo.' [Citation.] In fact, there are many San Anselmo houses that were built earlier than 1908, which is the year the 260 Crescent house was built. [Citation.]

"At page 2, lines 2–4, she states: '[t]o accommodate the Jenkins'[s] proposal for a new home, the Town Council *issued its first-ever approval for demolition of an over-100-year-old structure* in its historic Seminary neighborhood. . . .' [Citation.] This too was demonstrably false. Planning Director Elise Simonian had identified about twelve vintage houses the Town had previously approved to be demolished and replaced with new construction, without first preparing an Historic Resource Evaluation, including eight that were identified by the Inventory as eligible for listing for local historic status. [Citation.] [¶] . . . [¶]

"At page 2, lines 13-14, she states '[t]he Council also recognized need for, and imposed, mitigation measures that now defeat the exemption.' [Citation.] Again, the trial court found the CEQA exemption was not before the Court and the referenced mitigation measures were conditions of approval that do not defeat the exemption. [Citation.]

33

"At page 3 at lines 8-11, she states 'Laurel Mellin objected to the Town's approval of the 260 Crescent Road project and exhausted administrative remedies and acquired standing on behalf of herself and the later-formed group.' [Citation.] The trial court specifically ruled, based on the record presented, that Ms. Brandt-Hawley's client(s) did not exhaust administrative remedies and therefore waived their arguments resisting the CEQA categorical exemption. [Citation.]

"At page 6, line 12 and again at page 8, line 11, Ms. Brandt-Hawley injects as 'fact' a statement that finds no support in the record—that the house at issue was a 'historic' house and that the house 'qualifies as historic under the General Plan Policy 6.1.' [Citation.] Again, there is nothing in the record to support this and the trial court pointed out that this was not the case. [Citation.]

"At page 5, lines 10-12, she states '[a]bsent the relief prayed for, the project will proceed with significant irreparable and irreversible environmental impacts to the town's environment and its residents.' [Citation.] There were no environmental impacts associated with this project. [Citation.]"

Mr. Jenkins also referred to the hearing on the petition, where he claimed Ms. Brandt-Hawley misrepresented the facts in her argument before Judge Sweet, identifying five specific misrepresentations.

As noted, Ms. Brandt-Hawley did not respond to any of Mr. Jenkins's charges. Again, indifference.

But it was not only Mr. Jarvis or Mr. Jenkins who said Ms. Brandt-Hawley failed to state the record fairly or accurately. As Judge Chou summed it up in his conclusion on the issue: "Plaintiffs contend that Defendants knew their claims were untenable given their background and

34

expertise but continued to pursue them anyway, Plaintiffs' counsel advised Defendants four times that their arguments were frivolous, Defendants' failure to present the record fairly supports a finding they knew their claims were untenable, Defendants made misleading arguments, Defendants filed and swiftly dismissed the Writ of Supersedeas, and Defendants maintained their appeal for three months and offered to dismiss the appeal only if Plaintiffs agreed to waive any claim to fees and costs." "Failure to present the record fairly." Making "misleading arguments." That is more evidence of malice.

Ms. Brandt-Hawley's lengthy declaration in support of the anti-SLAPP motion describes what she did before filing the petition, including that she reviewed the "project related documents." But one thing missing from the declaration is any testimony she did any legal research. As the Supreme Court has recognized, where a case is brought without probable cause—as here—"the extent of [an] attorney's investigation and research may be relevant to the further question of whether or not the attorney acted with malice." (*Sheldon Appel*, *supra*, 47 Cal.3d at p. 883.)

On the issue of malice, Brandt-Hawley relies on *Dunning* and asserts this: the "alleged proof [of malice] rests almost entirely on the Jenkins'[s] assertion that their attorney informed Brandt-Hawley that he believed the action was frivolous. They then reason that, because Brandt-Hawley 'knew' the action lacked merit, her decision to continue litigating and to take routine litigation actions demonstrates malice." As noted, there is much more evidence here. And *Dunning* is easily distinguishable.

*Dunning* involved a malicious prosecution action brought by the developers of a private secondary school against a neighboring ranch and its attorneys, after the developers succeeded in having an environmental

35

challenge to the development project dismissed. The trial court granted the defendants' anti-SLAPP motion. Plaintiffs appealed, and the Court of Appeal affirmed in part and reversed in part, holding that the malicious prosecution case should have survived the anti-SLAPP motion as to the ranch. However, as to the attorney defendants, the Court held there was no prima facie showing of malice, on the fundamental basis that the motives of their clients would not be imputed to their attorneys. (*Dunning*, *supra*, 64 Cal.App.5th at p. 176.) The Court also rejected as unsupported the developers' arguments that malice was shown by the settlement negotiations, which, they claimed, " 'may have been negotiated to wear [the developers] down,' " which would avoid a " 'decision on the merits' " and thus reduce the likelihood that the ranch would sue the attorneys for malpractice. (*Id*. at p. 178.) In short, *Dunning* was one Court of Appeal's de novo review that led it to conclude that the sparse record there was " 'insufficient as a matter of law to establish malice.' " (*Ibid*.) The record here for our de novo review is a far cry.

**Some Observations on the Amicus Briefs**

Three amicus briefs were filed in support of Brandt-Hawley, by: (1) Remy Moore Manley, LLP, a Sacramento law firm that does CEQA work, has litigated extensively with Ms. Brandt-Hawley, and whose partner served as "faculty and seminars" with Ms. Brandt-Hawley (the RMM brief); (2) Richard M. Frank and Sean B. Hecht, respectively professors at U.C.L.A. and UC Davis Law schools (the Frank/Hecht brief); and (3) the Environmental Law Foundation and Planning Conservation League, a clinic at Stanford Law School (the ELF/PCL brief).

To various extents, the briefs make arguments addressing some issues on the merits, arguing things such as the claims in the writ petition were

36

"tenable," and had "minimal merit." These claims were addressed above, and nothing more need be said about them here.

The RMM brief asserts that its experience litigating other cases against Ms. Brandt-Hawley "undermines the suggestion" she acted with malice here. Passing over what might be called admissibility or relevancy issues—what Ms. Brandt-Hawley's conduct in other cases has to do with her conduct here—the RMM's biased comments have nothing to do with the situation here.

All three amicus briefs suggest that CEQA-related cases should be in essence immune or insulated from malicious prosecution cases, arguing things such as CEQA is too "uncertain" and too "complicated" for there ever to be a malicious prosecution claim. Nothing is cited in support of any such special carve out.

But not only that, we recently published a 107-page opinion in a CEQA case, *Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, that involved a 43-unit residential development in Marin County. Our opinion ended with "closing observations" that included citations to, and quotations from, various cases and law review articles that described the possible misuse of CEQA actions, and the harm they could cause. Among other things we noted that while "CEQA was meant to serve noble purposes . . . it can be manipulated to be a formidable tool of obstruction." (*Id.* at p. 782.)

The Frank/Hetch and ELF/PCL briefs assert that allowing cases like that brought by the Jenkinses will chill legislative advocacy and result in reduction in court access regarding cases challenging government actions, advancing environmental enforcement and justice, and involving novel environmental legal claims. We see no such correlation, and those cases, like

37

all others, should allow for a broad degree of freedom in legitimate CEQA advocacy, while also protecting litigation defendants (such as the Jenkinses) from having to fend off litigation brought without probable cause and malice.

Along those same lines, the ELF/PCL brief asserts that allowing the Jenkinses's case to proceed will deter private citizen enforcement actions and create a barrier to the advancement of environmental justice. Contrary to the sweeping alarmist predictions, the Jenkinses's lawsuit does not preclude or deter "public participation" or "[a]ctive citizen involvement" in important environmental matters. The Jenkinses did not challenge the administrative proceedings, the appeal, or the ability of citizens and individuals to voice their concerns during the public comment periods or thereafter. The Jenkinses did not name any individual in their lawsuit, nor even the group that brought the petition against them. Rather, based on the evidence and the law, they named only Brandt-Hawley due to the specific nature of her untenable claims—and her apparently deliberate indifference in the petition.

The ELF/PCL Brief references "environmental" protection and regulation, but the Jenkinses's situation has nothing to do with environmental protection and everything to do with the privacy and aesthetic design concerns of several of the Jenkinses's neighbors.
Finally, the Jenkinses's lawsuit has nothing to do with "disadvantaged communities," "underserved communities," "marginalized communities," "pollution," "human health consequences," or "urban decay," to name just a few of the topics raised in the ELF/PCL brief. To the contrary, we find that the description in the Jenkinses's brief is apt: the petition "here involved a group of well-off, 'NIMBY' neighbors living in one of the most expensive zip codes in the country trying to prevent their fellow neighbor from rebuilding a decrepit and dangerous residence on their property because the neighbors

38

were concerned about privacy and the design aesthetics of the new build. [Citation.] It had nothing to do with significant or negative environmental effects under CEQA, and the Jenkinses even fell within a clear-cut CEQA categorical exemption for single-family residences."

## DISPOSITION

The order denying the anti-SLAPP motion is affirmed. Respondents Charles and Ellen Jenkins shall recover their costs on appeal.

_____
Richman, J.


We concur:


_____
Stewart, P.J.


_____
Mayfield, J. *


*Jenkins v. Brandt-Hawley* (A162852)

     *Judge of the Mendocino Superior Court, Judge Cindee Mayfield, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

40

| | |
|---|---|
| Trial Court: | Marin County Superior Court |
| Trial Judge: | Honorable James Chou |
| Attorney for Plaintiffs and Respondents, Charles Jenkins and Ellen Jenkins: | Cannata, O'Toole, Fickes & Olson, LLP, Therese Y. Cannata, Mark P. Fickes, Zachary Colbeth, Aaron Field |
| Amicus curiae Environmental Law Foundation and Planning and Conservation League in support of Appellants | Environmental Law Clinic, Deborah A. Sivas, Molly Loughney Melius, Caroline Zhang |
| Amicus curiae Sean B. Hecht in support of Appellants | UCLA School of Law, Sean B. Hecht |
| Amicus curiae Remy Moose Manley, LLP in support of Appellants | Remy Moose Manley, LLP, Whitman F. Manley |
| Attorney for Defendants and Appellants, Susan Brandt-Hawley and Brandt-Hawley Law Group | Shute, Mihaly & Weinberger LLP, Ellison Folk, Lauren M. Tarpey, Peter Damrosch, Daniel P. Selmi |